**Charity D. MOORE, Appellant,**

v.

**JOHN HANCOCK MUTUAL LIFE IN-SURANCE COMPANY, Appellee.**

**No. 25055.**

United States Court of Appeals
Fifth Circuit.

July 12, 1968.

Rehearing Denied Aug. 14, 1968.

Robert M. Brake, Coral Gables, Fla., for appellant.

Robert E. Kurtz, Miami, Fla., for appellee.

Before GOLDBERG, GODBOLD and SIMPSON, Circuit Judges.

GODBOLD, Circuit Judge:

The appellant Charity D. Moore was the beneficiary on a life insurance policy insuring her husband, issued by John Hancock Mutual Life Insurance Company. She sought a declaratory judgment establishing her right to the policy proceeds. Summary judgment was entered for Hancock, and Mrs. Moore appeals. We reverse.

The policy contained the following suicide clause:

> If the Insured commits suicide, while sane or insane, within 2 years from the date of issue, the amount payable by the Company, in place of all other benefits, will be equal to the premuims (*sic*) paid less the amount of any loan advanced and not repaid to the Company in cash.

The insured was found by the trial court to have committed suicide, and it is not urged that such finding was error. The

11. Judges VOGEL and MATTHES do not join in this comment.

date of the policy was Nov. 1, 1965, the date of death Feb. 1, 1966.

The issues before us arise from the fact that the policy in question was obtained by conversion of the insured's rights under a Hancock group policy.[1] The order granting summary judgment does not say, and we are unable to ascertain from the record with assurance, whether the group policy contained a suicide clause, but we are told by counsel on oral argument that it did not. Central to an understanding of the case is the fact that in addition to seeking recovery under the individual policy the appellant requested as alternative relief that the individual policy be reformed if that relief proved necessary and appropriate.

The insured was an employee of Howard Johnson, Inc. of Florida, from Sept. 27, 1954 through Sept. 30, 1965. The original group policy was issued in 1941 to "Howard D. Johnson Company and Associated Companies," whose address was shown as Wollaston, Massachusetts. Apparently—and we emphasize the tentativeness of the word, for the record presented to us is piecemeal and helter skelter—the Florida company came under the original policy as a subsidiary, and then at a subsequent time a separate group policy was issued naming Howard Johnson, Inc. of Florida, as the employer. In any event there have been numerous additions, amendments and riders, and from the record we are unable to assemble into a meaningful and complete entity the group policy in force and applicable to the decedent at the time he left the employ of the Florida

company and under the conversion procedure obtained the individual policy.

Following the usual industry practice Moore did not receive a copy of the group policy but a short certificate showing he was an insured under the group policy, and describing his coverage and his beneficiary.[2]

There is uncertainty as to the exact phraseology of the conversion privilege that governed when the decedent exercised his right to obtain an individual policy. The clause identified to us by counsel (but differing in some of its phraseology from that quoted in the court's order granting summary judgment) reads:

## CONVERSION PRIVILEGE

Conversion Privilege

A. Any employee, upon written application made to the Company within thirty-one days after the earlier of the following dates:

(a) the date of termination of his employment, as hereinbefore defined, for any reason whatsoever, or

(b) the date of termination of his membership in the class or classes of employees insured hereunder,

or any employee to whom the provision entitled "Waiver of Premium Benefit in the Event of Permanent and Total Disability" is applicable, within thirty-one days after:

(c) the date of cessation of his rights under said provision,

1. Rights of the insured under group insurance policies is a developing area of the law. Group insurance, a product of the twentieth century, has enjoyed phenomenal growth. It began about 1913. As of 1959, approximately 36 million employees had group life insurance, 20 million had group disability and 44 million had group hospitalization. Cox, Group Insurance Contracts for Employees, 38 Tex.L.Rev. 211 (1959).

2. It is generally settled that terms of the contract are defined by the group policy,

not the individual certificate. See, e.g., Boseman v. Connecticut Gen. Life Ins. Co., 301 U.S. 196, 57 S.Ct. 686, 81 L.Ed. 1036 (1937); Metropolitan Life Ins. Co. v. Lewis, 142 So. 721 (La.App.1932); Thull v. Equitable Life Assurance Soc'y, 40 Ohio App. 486, 178 N.E. 850 (1931); Seavers v. Metropolitan Life Ins. Co., 132 Misc. 719, 230 N.Y.S. 366 (1928); Austin v. Metropolitan Life Ins. Co., 142 So. 337 (La.App.1932).

shall be entitled to have issued to him by the Company, without evidence of insurability, an individual policy of life insurance subject to the following conditions and provisions:

(I) [sic] such individual policy shall be in any one of the forms then customarily issued by the Company, except term insurance;

(2) the premium for such individual policy shall be the premium applicable to the class of risk to which the employee belongs and to the form and amount of the policy at the employee's attained age (nearest birthday) at the date of issue of such individual policy;

(3) the amount of such individual policy shall be equal to (or at the option of the employee, less than) the amount of the employee's insurance hereunder which was discontinued on whichever of the dates specified in paragraphs (a), (b), and (c) above is applicable;

(4) the first premium payment on such individual policy of Life Insurance so issued shall be made to the Company within the thirty-one-day period during which application for such individual policy may be made.

B. Any employee, upon

(a) termination of the insurance of the class of employees of which he is a member, or

(b) termination of this Policy by either the Employer or the Company,

shall be entitled to the rights and benefits set forth in subdivision A of this provision, in accordance with its terms and conditions, provided his insurance has been continuously in force for at least five years immediately preceding such termination, except that the amount of such individual policy shall not exceed the lesser of

(i) the amount of such employee's insurance under this Policy at the date of such termination, less any amount of life insurance for which he may be or may become eligible under any Group Policy issued by the Company or by any other insurer within thirty-one days after such termination, and

(ii) $2,000.

For the purpose of this provision, if any employee was insured for Life Insurance under another Group Policy issued by the Company to the Employer or to a subsidiary or affiliate of the Employer immediately prior to the date his insurance under this Policy became effective, the period during which the employee was continuously insured under such other Group Policy immediately prior to said date shall be included in calculating the five year period specified herein.

C. Insurance under any individual policy issued in accordance with this provision shall become effective at the end of the thirty-one-day period during which application for such individual policy may be made.

Extension of Death Benefit during Conversion Period. In the event of the death of the employee during the thirty-one-day period within which the employee may make application for an individual policy, as set forth in the foregoing provision, the Company shall pay to the beneficiary as a death benefit the maximum sum for which an individual policy could have been issued under the foregoing provision, whether or not the employee shall have made written application for such individual policy.

For the purposes of this provision, the date of termination of the Policy in case of its expiration by its own terms shall be the effective date of such expiration irrespective of the grace period specified in the Policy for the payment of any premium falling due on such date.

\* \* \* \* \* \*

In the event of the death of the beneficiary or beneficiaries last named by the employee prior to that of the employee, or if no beneficiary shall have been named, the Life Insurance or the commuted value of any remaining installments thereof payable as herein provided, as the case may be, shall be paid to the executors or administrators of the employee, except that the Company may in such case, at its option, pay such insurance to any one or more of the following surviving relatives; wife, husband, mother, father, child

\* \* \* \* \* \*

Within 31 days following termination of his employment Moore executed an application for conversion, using a form furnished by Hancock. Hancock then issued the individual policy.

The basis for grant of summary judgment was that the individual policy was a new and separate and independent contract and all rights, privileges, liabilities and obligations between the insured and Hancock were confined to its four corners. But this overlooks the prayer for reformation to require that the individual policy conform to and carry out the terms of the group policy. Appellant claims rights not only by what the new policy said but also by what it was supposed to say by reason of decedent's contractual rights under the group policy.

■ There are other questions too that were not put to rest, making summary judgment inappropriate. The parties have discussed pro and con the provisions of, and the policy reasons underlying, the Florida statutes which set out conversion rights that must be included in every "policy of group life insurance [shall be] delivered in [Florida]." Fla. Stat.Ann. § 627.0407 to -.0417 (1960). Appellant has even requested we certify to the Florida Supreme Court the question of the effect of the statute. But all this is too fast. There is some indication from the record that the 1941 group policy was executed and delivered in Massachusetts, by Hancock, apparently a Massachusetts-based company, to the parent Howard Johnson company, also apparently based in that state.[3] But from what is now available to us we can only speculate on the place of execution and delivery of whatever master policy governed Moore, and the numerous other indicia that may shed light on whether the courts of Florida, applying Florida conflict of laws rules, would choose Florida law, Massachusetts law, or some other law in deciding what interpretation is to be given the master policy.[4] One group policy may cover thousands of employees whose certificates are delivered to them in many states having varying requirements. Without intending a definitive list we point out that in making a choice of law in group insurance cases the courts have considered the place where the application for the master policy was dated, the place of issue, place where binding premium paid, place of delivery to the employer, and place of delivery of the individual certificate to the employee, and have reached differing results. See Annot., Conflict of Laws as to Group Insurance, 72 A.L.R. 2d 695 (1960). State statutes purporting to make local law controlling of group policies have been held ineffective under some circumstances.[5]

---

3. Massachusetts too has a statute prescribing required provisions for group policies. Mass.Laws Ann. ch. 175, § 134 (1959 & Supp.1967). Presumably the similar provisions in the statutes of many of the states requiring specified conversion privileges arise from efforts of the National Association of Insurance Commissioners to secure uniformity. Allyn, Group Life Insurance: Development, Codification, Trends and Use. 1953 Ins. L.J., 389, 391.

4. The federal courts sitting in Florida will apply the Florida conflict of laws rules. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Griffin v. McCoach, 313 U.S. 498, 61 S.Ct. 1023, 85 L.Ed. 1481 (1941); see Wright, Federal Courts § 57 (1963).

5. Boseman v. Connecticut Gen. Life Ins. Co., 301 U.S. 196, 57 S.Ct. 686, 81 L.Ed. 1036 (1937); Protective Life Ins. Co. v.

In connection with the choice of law problem, we point out that some states by statute govern the rights of insurer and insured in the event of death by suicide, and the statutory provision may automatically become part of such insurance contract as is subject to the terms of the statute. 1 Appleman, Insurance Law and Practice § 361 (rev. ed. 1965). We hazard no guess on the presence, absence or applicability of any such statute to either group or individual policy or both.

Once the controlling master policy has been unified and identified and a choice of law made it appears to us that construction of the master policy may be in order to determine whether Moore was entitled to receive an individual policy without a suicide clause. Through the varying conversion clauses in the record and in briefs, and conversion clause terms that are required by state statutes which may, or may not, be applicable, there appears to run a consistent thread of a right in the employee to have issued to him an individual policy in a form customarily issued by the company at the time of conversion. Putting on what we say the caveat that we do not know with what exact language we are dealing, we can foresee a possible issue of whether the "form" or "type" of policy referred to relates to type of insurance, i. e., ordinary life, 20-pay life, endowment, etc., or to policy provisions such as a suicide clause.[6] If "form" means policy language rather than form of insurance, the record is silent at this time on whether the suicide clause was or was not customarily included in individual Hancock policies when Moore's policy was issued, and if included of what duration.

Once it is established what Moore's rights were under the applicable conversion clause, then there may come to bear the question whether there has been such mistake of fact or of law in issuing the individual policy with a suicide clause in it as to entitle the appellant to reformation deleting or limiting the suicide clause. If the suicide clause remains a part of the individual policy we can see several possible questions. Did the period of the suicide clause begin to run at the date of Moore's certificate of group insurance or at the date of his individual policy? This was the question in Provident Life & Accident Ins. Co. v. Kegley, 199 Va. 273, 99 S.E.2d 601 (1957), in which suit was explicitly on the individual policy, and the group policies were not in evidence; finding no ambiguity in the individual policy the court counted from its date of issue. As a matter of construction, are group policy and individual policy to be read together, and if so is the suicide clause to be given effect—i. e., though there may be no such mistake as would require policy reformation, what effect does the suicide clause have, in view of its purpose and the fact that the group policy apparently had no such clause?[7] Also, which prevails—the suicide clause or the incontestability clause which the group policy apparently contains (or the

Lamarque, 180 Miss. 243, 177 So. 15 (1937). At this juncture it would be fruitless for us to explore whether "delivery" under the Florida statute means place of delivery of the group policy or of the individual certificate.

6. Suicide is a cause of loss, a risk either insured against or not insured against. 1 Appleman, supra § 369, at 689.

7. See the views of the Tennessee Supreme Court in Silliman v. International Life Ins. Co., 131 Tenn. 303, 174 S.W. 1131 (1915), that the purpose of the suicide clause is to provide an initial limited period in which the insurer can satisfy itself of the honest purposes of the insured and protect itself from the fraud of an applicant who plans self-destruction, that the insured is entitled to have such protection for the insurer confined to such initial period of insurance, and the insured having outlived the initial period the status he then enjoys may not be taken from him by the company by indirection.

Compare the present case where if counsel are correct that the group policy had no suicide clause the risk of self-destruction was one that, at least for the group as such, Hancock did not seek to protect itself against.

incontestability clause of the individual policy, if the two-year period for which it provides begins to run when Moore received his certificate)?[8] The relation of suicide clause and incontestability clause was the problem in Lineberry v. Security Life & Trust Co., 238 N.C. 264, 77 S.E.2d 652 (1953), which concluded that a one-year incontestability clause in the group policy did not limit a two-year suicide clause in the individual policy.[9] Baugh v. Metropolitan Life Ins. Co., 173 Tenn. 352, 117 S.W.2d 742 (1938), holds the incontestability clause of the group policy to be paramount over the suicide clause of the individual policy.

Two other cases deserve comment. Aetna Life Ins. Co. v. Dunken, 266 U.S. 389, 45 S.Ct. 129, 69 L.Ed. 342 (1924), treats a twenty-pay life policy issued on surrender of a term policy as not a novation or an agreement arising from new or additional promises but the discharge of a pre-existing obligation specifically incurred under the original contract. Western & Southern Life Ins. Co. v. Shelby, 101 Ind.App. 1, 194 N.E. 197 (1935), which followed *Silliman*, is the same type case. Hancock strenuously urges upon us the significance of the making of a new application before the individual policy issues, and distinguishes *Dunken* and *Shelby* on the ground that in both the original application was agreed to remain in force and to apply to, or be part of, the new policy. Counsel appear to have overlooked that the application for conversion signed by Moore included the provision, "This application * * * with the application on which the original Policy or Annuity was issued, shall be a part of the new Policy and copies of said applications shall be attached to the new Policy."

 There is little of which this court can be certain about this case ex-

cept that it was not ripe for summary judgment. What we have to say as a sort of tentative chart of issues is not intended to set boundaries of what is to come up and be dealt with at a trial on the merits, nor do we indicate what result should be reached on any issue.

Reversed and remanded for proceedings not inconsistent with this opinion.

---

8. On the general question of interplay of suicide clause and incontestable provisions, see 1 Appleman, supra § 369.

9. No reformation was sought, and the issue of whether the suicide clause was correctly in the individual policy was not treated.