366 N.W.2d 760 (1985)
219 Neb. 824
Alan BAYER, Plaintiff,
v.
FATHER FLANAGAN'S BOYS' HOME, Defendant.
No. 84-526.
Supreme Court of Nebraska.
May 3, 1985.
*761 Robert A. Green of McGrath, North, O'Malley & Kratz, P.C., Omaha, for plaintiff.
Robert D. Mullin of Boland, Mullin & Walsh, and F. Vinson Roach, Omaha, for defendant.
KRIVOSHA, C.J., and BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.
PER CURIAM.
This matter comes before us pursuant to Neb.Rev.Stat. § 24-219 (Cum.Supp.1984) as two certified questions of law from the U.S. District Court for the District of Nebraska. The main thrust of those questions is a request that we interpret Neb. Rev.Stat. § 44-1633 (Reissue 1984).
The pertinent portion of § 44-1633 reads as follows:
An employer ... group policy ... delivered... in this state which provides hospital, surgical, or major medical coverage... shall provide that an employee whose hospital, surgical, or major medical coverage under the group policy ... would otherwise be terminated because of the involuntary termination of employment of such employee, for reasons other than misconduct ... shall be entitled to continue such coverage subject to the provisions of the group policy ... and the following conditions:
(1) Such coverage shall be continued on a monthly renewal basis until the earliest of the following dates:
(a) The date of expiration of a period of six months following the date the coverage of the terminated employee would otherwise be terminated;
(b) The date the terminated employee becomes eligible for other group hospital, surgical, or medical coverage ....
The relevant facts are set forth in the request for certification provided by the U.S. District Court.
Plaintiff, Alan Bayer, was employed by the defendant, Father Flanagan's Boys' Home, and in the latter part of the year 1981 was notified that his employment would terminate as of September 1, 1982. He then accepted an employment offer with Virginia Polytechnic Institute (VPI), to commence on or about September 1, 1982. Sometime thereafter, the defendant agreed to continue plaintiff's employment through September 30, 1982, because of accumulated vacation time.
While working for the defendant, the plaintiff and his dependents were covered under a group medical and hospital plan to which the employer and employee each made contributions. In May of 1982 one of plaintiff's dependent daughters was diagnosed as suffering from anorexia nervosa and was hospitalized for approximately 3 weeks. She was again hospitalized for treatment of the same illness in August of 1982. All of these bills were paid by defendant's group policy.
On September 1, 1982, plaintiff became eligible for and enrolled himself and his dependents in VPI's group hospital, surgical, or medical plan for full-time staff members.
The defendant, on September 20, 1982, without knowledge that plaintiff had enrolled *762 in this other group medical plan, furnished plaintiff with written notice of his right to elect for continued group coverage pursuant to the provisions of Neb.Rev. Stat. §§ 44-1633 and 44-1634 (Reissue 1984). Plaintiff notified defendant of his election to remain in that group and paid the first two monthly premiums.
Following his termination from the Boys' Home employment, but during the 6-month statutory period in late October of 1982, plaintiff's daughter was again hospitalized for the same condition as before, and incurred medical and hospital expenses of $31,458.52. He submitted that claim to defendant's group plan. On the advice of that plan's administrator, the claim was denied, and defendant returned to plaintiff, or tendered the return of, the premiums paid. The basis of this rejection was subsection (1)(b) of § 44-1633, i.e., at the time these expenses were incurred the plaintiff had become eligible for, and in fact had obtained, "other group hospital, surgical, or medical coverage."
Plaintiff's problem, of course, is that the VPI group policy, as do most such policies, contained a waiting period which effectively denied or prohibited coverage for the October hospitalization. He therefore urges that his coverage continue for the full 6 months under defendant's group policy.
The U.S. District Court certified the following questions to this court for decision:
Under the provisions of [Neb.Rev.Stat. § 44-1633(1)(a) and (b) (Reissue 1984)]:
1) Is an employee who is to be involuntarily terminated August 31, 1982 (subsequently extended to September 30, 1982), eligible to obtain statutory continued coverage at time of termination when he is, in fact, already eligible for and enrolled in a new employer's "other group hospital, surgical or medical coverage" plans for part-time employees as of May 1, 1982, and for full-time employees as of September 1, 1982?
2) Does the statutory phrase "becomes eligible for other group hospital, surgical or medical coverage" become nugatory, at least as the same pertains to coverage of a pre-existing illness, if a new employer's group health plan for which the employee is eligible does not immediately make available all of the coverage which was available under the former employer's plan? (Please assume that the new employer's group health plan contains a usual waiting periodtwelve months in this instancebefore claims for hospital and medical expenses for a pre-existing condition will be paid.)
These questions pose for us a problem of statutory interpretation, i.e., do the words "becomes eligible for other group ... coverage," as used in § 44-1633, mean "becomes eligible for other identical coverage" as urged by Bayer, or do they mean "becomes eligible for other group coverage of some type" as suggested by the Boys' Home? The statement of the rules which we are required to apply in accomplishing this task is quite simple; their application in this instance is somewhat more complicated.
Although several states have statutes similar to § 44-1633, neither counsel nor this court has been able to find any cases interpreting these or similar sections. Therefore, we are left pretty much to our own devices, guided by accepted rules of statutory construction.
It is helpful to restate the section by eliminating a number of the insignificant phrases, so as to try to ascertain just what the Legislature stated. It would then appear as follows: "[A]n employee whose hospital, surgical, or major medical coverage under the group policy ... would otherwise be terminated ... shall be entitled to continue such coverage ... [until] [t]he date the terminated employee becomes eligible for other group hospital, surgical, or medical coverage." (Emphasis supplied.)
Bayer insists that, to make any sense, "other coverage" must mean the same as "such coverage" as the insured formerly enjoyed. The Boys' Home contends that "other" means "different" and that if the Legislature intended to have said "identical coverage," it could have done so.
*763 A statute is not to be read as if open to construction as a matter of course. County of Douglas v. Board of Regents, 210 Neb. 573, 316 N.W.2d 62 (1982). However, in the consideration and application of a statute, it is the obligation of the court to determine and give effect to the purpose and intention of the Legislature as ascertained from the entire language thereof, considered in its plain, ordinary, and popular sense. Adkisson v. City of Columbus, 214 Neb. 129, 333 N.W.2d 661 (1983).
A sensible construction will be placed upon a statute to effectuate the object of the legislation rather than a literal meaning that would have the effect of defeating the legislative intent. Miller v. Peterson, 208 Neb. 658, 305 N.W.2d 364 (1981).
"It is a fundamental rule of construction that in construing statutes this court will, if possible, try to avoid a construction which leads to absurd, unjust, or unconscionable results." Adkisson, supra at 134, 333 N.W.2d at 665.
We believe the intent of the Legislature in drafting this statute to have been that an employee was entitled to continue the coverage that he had until he was able to replace "such coverage." To hold otherwise would make the benefit illusory. Paraphrasing from Moore v. John Hancock Mutual Life Insurance Co., 436 F.2d 823 (5th Cir.1971), indeed, there would be no reason for the insertion of the right to continue such coverage in a policy of insurance if the insured could thereby get nothing more than what would have been available had there been no right of continuance of coverage and the insured had simply made application for a new policy with no relation to the coverage provided by the prior policy.
Our answer to the first question is "Yes," under the facts and circumstances in this case.
Considering the conclusion we have reached, we find it unnecessary to address the second question.
Judgment is entered accordingly.
JUDGMENT ENTERED.