SILLIMAN *v.* INTERNATIONAL LIFE INSURANCE COMPANY.*

(*Nashville.*   December Term, 1914.)

1. INSURANCE. Life insurance. Suicide. Exchange of policy.

   In 1910 insured took out a life insurance policy for five years, which provided that he might, at any premium date, exchange it for any form of policy then in use, at the premium nxed by his age at the time the exchange was made, or at the age of the original policy, by paying the difference in premiums for the past years, with interest. The policy also provided that in case of suicide within one year from its date the company should be liable only for the amount of the premiums paid. Four years thereafter insured demanded an exchange of his policy for another form, refusing to make a new application with health certificate, and the company made the exchange on the old application, stating that the new policy was issued in exchange for the former one. The premium paid was the premium for the age of insured at that time. The new policy provided that in case of suicide "within one year from the date on which this insurance begins," the limit of recovery should be the premiums paid. Insured committed suicide six months after the change was effected, and the beneficiary refused the company's tender of the premium paid on the exchange policy. *Held,* that the two policies were in effect one and the same contract, and that the insurance began, within the meaning of the suicide clause in the second policy, at the time of the issuance of the original policy. (*Post, pp.* 308-313.)

   Case cited and distinguished: Gans, Ex'r v. Aetna Life Ins. Co., 108 N. E., —.

2. INSURANCE.   Life insurance.   Suicide clause.   Construction.

   A provision in a life insurance policy, limiting recovery thereon to the amount of the premium in case of suicide while sane

   ——————
   *For the effect of a provision avoiding policy if death results from suicide, "sane or insane," see note in 17 L. R. A., 89.

or insane within one year from the date thereof, is reasonable, and should be favorably considered by the courts to prevent fraud on the companies. (*Post*, *pp.* 313-315.)

Cases cited and approved: Billings v. Ins. Co., 64 Vt., 78; Mut. L. Ins. Co. v. Wiswell, 35 L. R. A., 262.

---

FROM GILES

---

Appeal from the Chancery Court of Giles County.— W. S. BORDEN, Chancellor.

CHILDERS & WOODWARD, for appellant.

E. E. ESLICK, for appellee.

MR. CHIEF JUSTICE NEIL delivered the opinion of the Court.

This case is before us on bill and demurrer, the bill setting forth the following facts:

In January, 1910, the Tennessee Life Insurance Company issued to William B. Silliman a policy of insurance on his life for the sum of twenty-five hundred dollars, payable to his wife Mattie I. Silliman. The consideration was the payment of "thirty-eight and 23/100 dollars in advance, being the premium for one year's term insurance, and the payment of a like sum of thirty-eight and 23/100 dollars on or before the 12th day of January in every year thereafter during four years of the life of the insured." The policy provided that it should be incontestable after the expira-

tion of one year from the date of its issue except for nonpayment of premiums. It contained also the following "privilege of exchange."

"This policy is issued for a term of five years from the date hereof and no longer, but on any anniversary of this policy and while in force, the company will, upon its surrender, grant in exchange therefor, without medical re-examination a new policy on any plan then written for an amount not greater than the sum insured by this policy, and at the rate of premium required for this (the) kind of policy chosen at the age then attained, or at a premium rate required for the original age and date, upon the payment of the difference in premiums with six per cent. interest per annum."

The policy contained likewise the following condition:

"In case of suicide committed while sane or insane within one year of the date hereof, the liability of the company shall not exceed the amount of the premiums paid on this policy."

Between the date of the issuance of the policy above mentioned and the 12th day of January, 1914, the defendant, International Life Insurance Company, took over all of the assets of the Tennessee Life Insurance Company, and assumed and bound itself to carry out all of the contracts and obligations of the former company. Up to the time of this assumption the insured promptly paid his premiums to the former company, and on being informed of the assumption he thereafter

paid his premiums to the latter company, and his policy was in full force, on the 12th day of January, 1914, when, to quote the bill:

"In accordance with the terms of said policy and upon the demand of the said W. B. Silliman therefor, the defendant company issued to the said W. B. Silliman its policy No. 26688, being a whole life or ordinary life policy, with the annual premium of $90.40, which said amount was paid in full by the said W. B. Silliman on said date, and said policy of insurance was made payable to the complainant, Mattie I. Silliman, in the sum of $2,500, upon the death of the insured. This policy of insurance was issued by defendant in accordance with the terms of the said first policy, and upon the demand of the said W. B. Silliman therefor. No new application was made for said policy, and the original application made to the Tennessee Life Insurance Company, above mentioned, or a photographic copy of the same, was attached to the new policy by the defendant. . . . "

There was also attached to said policy a rider in these words:

"This policy is issued in exchange for and in lieu of Tennessee Life policy No. 757 issued by the Tennessee Life Insurance Company."

It also contained a provision that it was nonforfeitable "from date of issue and incontestable after one year," and the following clause on the subject of suicide:

"In case of suicide, committed while sane or insane within one year from the date on which this insurance begins, the limit of the recovery hereunder shall be the premiums paid."

The bill continues:

"In the year 1910, the said W. B. Silliman was stricken with some disease of the stomach and bowels, the exact nature of which the physicians were unable to determine, and was from that time and until the time of his death in a helpless and hopeless condition, being unable to leave his home or to take any nourishment except liquids. During this period he continued to suffer the greatest agony of mind and body, and was thought by his physicians to be at all times in imminent danger of death. This condition was well known to the defendant company at the time the said W. B. Silliman made the demand for the policy to which he was entitled under his original contract. When demand was made by W. B. Silliman for the change in the form of his policy, the defendant company sent to him blanks upon which were to be made out a certificate of health. This application and this certificate of health he declined to execute, expressly demanding the issue of the new policy under the terms of the original contract and notifying the defendant company that he had taken the matter up with the insurance department of Tennessee, and their refusal to comply with their contract would result in a revocation of their license. The defendant company thereupon issued and changed the form of policy in accordance with the demand made

upon them, and in accordance with their original under-
taking, without any new application containing repre-
sentations and warranties, and without medical ex-
amination, the same being issued upon the original
application, and the representations and warranties
and medical examination which had been made in
1909."

On July 1, 1914, the insured died as the result of
suicide. Due proofs of loss were filed with the defend-
ant, to which no objection was made. The company,
however, immediately denied all liability under its
policy "except for the amount of the premium which
had been paid since the change in the form of the
policy," and on September 10, 1914, tendered this sum,
which was refused. Thereupon the present bill was
filed.

The defendant filed a demurrer containing in varying
forms the single defense that under the facts stated
no cause of action was shown. The chancellor over-
ruled the demurrer, but under the section of the Code
applicable to the subject granted an immediate appeal
to this court. Here the defendant assigned for error
the decree of the chancellor in overruling the demurrer.

We think the decree of the chancellor should be
affirmed. It seems to us quite clear that under the facts
stated the new policy was but a continuation of the
same insurance contract. It was based on the old
application and the old medical examination, and the
new terms were in strict accord with the provisions of
the first policy, granting to the insured the right to

make just such a selection to take the place of the original form. The same may be said of the higher rate of premium paid. We are unable to see how a different result can be based on the circumstance that the premium was fixed at the rate applicable to the age the insured had attained when the new policy was issued, that is, forty-eight years, rather than at the old rate, supplemented by the difference in cash, with six per cent. added. The two rates meant the same thing to the company, being but different expressions of the same price of insurance, but the choice of either was addressed simply to the convenience of the insured.

We are referred to the case of *Milton H. Gans, Ex'r, v. Ætna Life Ins. Co.*, decided by the court of appeals of New York, February 15, 1915, 108 N. E., —, as an opposing authority. There is a general resemblance between the facts of the two cases, but there are likewise important differences. In the *Gans Case,* the facts, so far as necessary to state them, were that on April 5, 1907, the company issued a "term policy" insuring the life of one Hockstadter for the term of five years—

"except: (a) Upon the expiration of the policy it might be renewed and continued for the successive term of five years each until the insured had passed the insuring age of sixty years, by paying premiums as prescribed by an included table; or (b) upon any anniversary of its date it might be 'exchanged upon medical re-examination for a new policy upon any plan then in use by said company on payment of premiums re-

quired for such new policy, for the insuring age then
attained by the insured'; or (c) be exchanged at any
time within five years from its date for a then lawful
policy of any kind issued April 5, 1907, by the company
to be dated April 5, 1907, and issued at the insurer's
age at that date, on payment of a sum equal to the
difference between the aggregate of the premiums then
actually paid and the aggregate of the premiums the
substituted policy should have earned from April 5,
1907, with interest, provided in either case of ex-
changed policies, 'the premium required by such new
policy shall be paid on the date stipulated for payment
of premiums under this policy, that the amount of in-
surance shall not be increased nor the premium rate
be less than required by this policy, and that applica-
tion for such new policy be made, and this policy re-
tired. ''

It is recited in the opinion that on April 3, 1912, the
insured made, under the second above option, a writ-
ten application to the company for a new policy, and
therein agreed that the statements and answers in
the application for the term policy ''shall be the basis
of a new contract or policy herein applied for and
form a part of the same, except that the kind of policy,
amount of same, and the premiums thereon, shall be
as specified below.'' It is further recited that the ap-
plication stated the kind of policy desired, and certified
in regard to the physical condition of the applicant,
and requested ''that the new policy contain the pro-
vision for disability.'' The opinion continues:

"In accord with the application for the 'new contract or policy,' which was made a part of this, the policy sued upon was isued. The appeal presents the single question, Did the two policies form a single contract made April 5, 1907, under which the suicide clause was at the death of the insured inoperative because the suicide was not within one year from April 5, 1907, as found by the trial term? The appellate division, reversing, found the contrary. . . . The policy in suit is dated April 5, 1912, and in it the insured, and the defendant said: 'If the insured shall commit suicide within *one year from the date hereof,* while sane or insane, the policy shall be null and void.' This is a rigid and certain agreement from which no doubt or hesitation as to its meaning can spring. They also said: 'The policy and the application herefor constituted the entire contract between the parties hereto. . . .' It is and must be conceded that there is no language or stipulation within the policy or application for it which conflicts with or affects the stipulation above quoted. The reference to the application in consideration of which the policy was issued is a strong confirmation of the integrity of the stipulation. It applies for a 'new contract or policy,' specifying the kind desired. The policy of April 5, 1912, is, in form and substance, an independent, complete, and isolated contract. It expressed no dependence on or connection with the term policy."

And so it was held that the policy of 1912 was a new and independent contract, and that the clause in

respect of death by suicide referred to the date of that policy, and, the suicide having occurred within one year of the date thereof, the policy could not be collected.

The differences between the policy sued on in the *Gans Case* and that before us are now apparent. Not only is there nothing to show that the policy of 1914 is "an independent, complete, and isolated contract," expressing no dependence on or connection with the term policy, but, on the contrary, it is expressly shown that they are connected, and that the second was issued because of and in compliance with the requirements of the first. Again, so far from there having been filed an application for a "new contract or policy," no application was filed at all, but simply a demand was made that another form of policy be issued in compliance with the agreement therefor in the first policy. It is also shown that this demand was sought to be evaded by the company through its suggestion for a new application, and a new health certificate, that this suggestion was repudiated by the insured, and his demand for compliance with the contract renewed, accompanied by a pointed reference to the fact that he had brought the matter to the attention of the insurance department of the State, and that thereupon the defendant yielded, and issued the policy which the insured demanded as a compliance with the contract contained in the term policy, and that defendant had attached to its policy the application filed with the term

Silliman v. Ins. Co.

policy, and a rider showing that its policy was issued "in exchange for and in lieu of" the term policy.

Furthermore, the suicide clause in the policy sued on does not refer to the date of this policy, but "within one year from the date on which this insurance begins." It is true that if the policy stood alone, "this insurance" would have to be construed as referring to the date of the policy; but it appearing from what we have already said that the dominant purpose was to carry out the contract embraced in the policy of 1910, this clause must be held to apply to the date of that policy, since it was then that "the insurance" began. Any other construction would result in giving an effect to the clause in question which would nulify the whole tenor of the contract between the parties. It may be true that the suicide clause as thus construed was a useless stipulation in the policy sued on, considered alone, since the one year from the date the insurance began had long since elapsed; but it is more consonant with the agreement of the parties, as evidenced by everything else in the case, that this clause would be treated as mere surplusage even than that it should be permitted to stand apart, and out of harmony with all of the other facts showing the true intent of the parties.

We believe that in general the suicide clause of the kind we have before us is treated favorably by the courts (*Billings* v. *Ins. Co.*, 64 Vt., 78, 24 Atl., 656, 17 L. R. A., 89, 33 Am. St. Rep., 913, and note; Note, also, to *Mut. L. Ins. Co.* v. *Wiswell*, 35 L. R. A., 262, 263),

since the commission of suicide by an insured while in his right mind, if such a thing be possible, which some doubt, in order that the beneficiary in the policy may collect it, is nothing less than a fraud on the company; and so much of the clause as refers to persons of unsound mind is likewise worthy of favorable consideration, since the evidence of such a condition is easy to fabricate and difficult for the insurer to overthrow. Therefore it is not at all improper that insurance companies should, by this clause, render unnecessary any inquiry into the mental condition of the insured at the time of his self-destruction. It is equally commendable that the limit should be brief, as being, on the one hand, sufficient to enable the company to satisfy itself of the honest purposes of the insured, while protecting itself against possible fraud on his part; and at the same time it is desirable that the insured should not feel that he should, during the whole life of the policy, be unprotected against the possibility of bringing death to himself by his own hand through the blameless misfortune of losing his mental faculties. The insured in the case before us had the right to guard against such a contingency, as we believe he did, by confining that contingency to the first year of his insurance. When he had lived through that year, and so outlived the clause in question, he had attained a *status* with the company more valuable than the one he held when he obtained his policy in 1910. We cannot think that it was his purpose to waive that advantage, or of the company by indirection to take it from him. Viewing the case as a

whole, we believe that we have given to the contract and writings of the parties the only construction which they can reasonably bear.

The result is that the decree of the chancellor must be affirmed, and the cause remanded for answer and further proceedings.