Charity D. MOORE, Plaintiff-Appellant,

v.

JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, Defendant-Appellee.

No. 29572.

United States Court of Appeals, Fifth Circuit.

Jan. 4, 1971.

Rehearing Denied April 16, 1971.

**824**

Robert M. Brake, Coral Gables, Fla., for plaintiff-appellant.

Robert E. Kurtz, Kurtz & Cooper, Miami, Fla., for defendant-appellee.

Before JOHN R. BROWN, Chief Judge, WISDOM and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

This is an appeal from a judgment entered in favor of the John Hancock Mu-

tual Life Insurance Company, the defendant below, in a suit to recover on a policy of life insurance brought by Charity D. Moore, the widow and beneficiary of the deceased insured, George R. Moore. We reverse.

Moore was employed by Howard Johnson Incorporated of Florida, a wholly-owned subsidiary of the Howard D. Johnson Company of Wollaston, Massachusetts, from 1954 until 1965. In 1960 John Hancock issued to Howard Johnson of Florida a group insurance policy providing group life insurance coverage to its employees. Under this policy, Moore was eligible for and acquired $1,000 of contributory life insurance coverage. In 1964 this policy was merged with the group policy issued to parent company, and under this arrangement Moore acquired a total contributory life insurance coverage of $10,000 and non-contributory coverage of $2,000.[1]

While neither group policy contained a suicide clause, both policies contained a two-year incontestability clause, in accordance with Florida Statutes § 627.-0409.[2]

Although the coverage provided under the group policies terminated when an employee left the active employ of Howard Johnson, a conversion privilege provision, in compliance with Florida Statute § 627.0415,[3] entitled a terminated

---

1. Contributory life insurance refers to insurance paid for by the employee, generally by a deduction from his salary. Non-contributory insurance refers to group coverage paid for by the employer.

2. Florida Statute § 627.0409, F.S.A. provides:

    The group life insurance policy shall contain a provision that the validity of the policy shall not be contested, except for nonpayment of premium, after it has been in force for two years from its date of issue; and that no statement made by any person insured under the policy relating to his insurability shall be used in contesting the validity of the insurance with respect to which such statement was made after such insurance has been in force prior to the contest for a period of two years during such person's lifetime nor un-

less it is contained in a written instrument signed by him.
    The *1960 policy* provides:
    Except for non-payment of premiums by the employer, this policy shall be incontestable after two years from the date of issue and the Life Insurance on an individual employee shall be incontestable after such insurance has been in force for a period of two years during such employee's lifetime.
    And the *1964 policy* provides:
    Incontestability. Except for nonpayment of premiums, this policy shall be incontestable after two years from the date of issue.

3. Florida Statute § 627.0415, F.S.A. provides:
    The group life insurance policy shall contain a provision that if the insurance, or any portion of it, on a person

employee to convert his insurance under the group life policy to an individual life policy providing equal protection, without a physical examination, if applied for within thirty-one days after termination. The applicable provisions of the conversion privilege in effect when Moore left the employ of Howard Johnson provides in pertinent part:

Conversion Privilege

A. Any employee, upon written application made to the Company within thirty-one days after the earlier of the following dates:

(a) the date of termination of his employment, as hereinbefore defined for any reason whatsoever, or

(b) the date of termination of his membership in the class or classes of employees insured hereunder,

\* \* \* \* \* \*

shall be entitled to have issued to him by the Company, without evidence of insurability, an individual policy of life insurance subject to the following conditions and provisions:

(1) such individual policy shall be in any one of the forms then customarily issued by the Company, except term insurance;

(2) the premium for such individual policy shall be the premium applicable to the class of risk to which the employee belongs and to the form and amount of the policy at the employee's attained age (nearest birthday) at the date of issue of such individual policy;

(3) the amount of such individual policy shall be equal to (or at the option of the employee, less than) the amount of the employee's insurance hereunder which was discontinued on whichever of the dates specified in paragraphs (a), (b), and (c) above is applicable.

(4) the first premium payment on such individual policy of Life Insurance, so issued shall be made to the Company within the thirty-one-day period during which application for such individual policy may be made.

\* \* \* \* \* \*

C. Insurance under any individual policy issued in accordance with this provision shall become effective at the end of the thirty-one-day period

covered under the policy ceases because of termination of employment or of membership in the class or classes eligible for coverage under the policy, such person shall be entitled to have issued to him by the insurer, without evidence of insurability, an individual policy of life insurance without disability or other supplementary benefits, provided application for the individual policy shall be made, and the first premium paid to the insurer, within thirty-one days after such termination, and provided further that:

(1) The individual policy shall, at the option of such person, be on any one of the forms, except term insurance, then customarily issued by the insurer at the age and for the amount applied for;

(2) The individual policy shall be in an amount not in excess of the amount of life insurance which ceases because of such termination, less, in the case of a person whose membership in the class or classes eligible for

coverage terminates but who continues in employment in another class, the amount of any life insurance for which such person is or becomes eligible under any other group policy within thirty-one days after such termination, provided that any amount of insurance which shall have matured on or before the date of such termination as an endowment payable to the person insured, whether in one sum or in installments or in the form of an annuity, shall not, for the purposes of this provision, be included in the amount which is considered to cease because of such termination; and

(3) The premium on the individual policy shall be at the insurer's then customary rate applicable to the form and amount of the individual policy, to the class of risk to which such person then belongs, and to his age attained on the effective date of the individual policy.

during which application for such individual policy may be made.

Extension of Death Benefit during Conversion Period.

In the event of the death of the employee during the thirty-one-day period within which the employee may make application for an individual policy, as set forth in the foregoing provision, the Company shall pay to the beneficiary as a death benefit the maximum sum for which an individual policy could have been issued under the foregoing provision, whether or not the employee shall have made written application for such individual policy.

\*     \*     \*     \*     \*     \*

Moore left Howard Johnson on September 30, 1965, and exercised his rights under the conversion privilege within thirty-one days, applying for a conversion of his coverage under the group policy to an individual three-year modified life policy providing $12,000 in coverage, identical to the total amount of coverage he was provided under the group policy.

4. The application provides in pertinent part:

    \*     \*     \*     \*     \*

    Application is hereby made for the exchange or conversion of the original Policy or Annuity, or conversion of the above identified Group insurance, for or into a new Policy in accordance with the following specifications:

    \*     \*     \*     \*     \*

    AGREEMENT: 1. The new Policy shall be issued in consideration of (a) this application, all statements and answers in which are complete, true, and correctly recorded, and (b) payment to the Company of the premium for the new policy and the cost, if any, of the exchange or conversion. 2. This application shall include any Statements to Medical Examiner which may be made in connection herewith and, with the application on which the original Policy or Annuity was issued, shall be a part of the new Policy and copies of said applications shall be attached to the new Policy. 3. The new Policy shall be a new, separate contract, and shall take effect and all of its provisions shall be operative as of its date of issue,

Moore executed an "Application for Exchange or Conversion"[4] and John Hancock's records treated the application as being a conversion of his rights under the Group policies. The application specifically referred by number to the last group policy and the certificate issued Moore thereunder; the Group Administration Department made out a "Conversion Card" for the transaction; and the "Issue Date Sheet" used by the Home Office of John Hancock referred to the transaction as a conversion. The application, which specifically incorporated by reference Moore's original application for group coverage, was made part of the policy issued to Moore on November 1, 1965.

The individual policy issued Moore contained an incontestability clause providing that

This policy except any Provision for Disability or Accidental Death Benefit, shall be incontestable after it has been in force during the lifetime of the Insured for 2 years from its Date of Issue, except for non-payment of premium.

upon its delivery, provided that any statement or statements made in this application are then true without material change; and when the new Policy takes effect all liability of the Company under the original Policy or Annuity shall cease. 4. The new Policy shall be subject to any assignment of the original policy or Annuity on record with the Company. Any unpaid indebtedness to the Company on or secured by the original Policy or Annuity shall, if such indebtedness does not exceed the maximum amount available as a loan under the new Policy, be transferred to and charged against the new Policy. 5. Any provision in the new Policy to the contrary notwithstanding, any rights and privileges thereunder may be exercised without notice to or consent of any revocable beneficiary. 6. Under any policy issued upon conversion from Group insurance, unless a date of issue has been herein specified, the date of issue of the new Policy shall be the date immediately following expiration of the period allowed for conversion in accordance with the Group Policy. \*     \*     \*

and a suicide clause, which provided:

If the Insured commits suicide, while sane or insane, within 2 years from the Date of Issue, the amount payable by the Company, in place of all other benefits, will be equal to the premiums paid less the amount of any loan advanced and not repaid to the Company in cash.

It is uncontested that Moore committed suicide on February 11, 1966, some four months after the issuance of the individual policy pursuant to the conversion privilege. John Hancock refused to pay the proceeds of the policy to Mrs. Moore, the named beneficiary, on the ground that suicide was an excluded risk under the terms of the policy, and instead offered to return the amount of the premiums already paid in. Mrs. Moore subsequently brought this action.

Mrs. Moore contended before the district court that, even if her husband's death was a suicide, she was entitled to the face amount of the policy because her husband had a contractual right under the group policy to have his rights under the group policy continued by conversion into an individual policy and, accordingly, the suicide clause ought to date back to the date when Moore first became insured under the group policies. Alternatively, she asked for a reformation of the individual policy to make it comply with her interpretation of the terms of the conversion privilege.

The district court initially granted John Hancock's motion for summary judgment, but on appeal this court held that the suit was not ripe for summary judgment and remanded the matter back to the district court for further proceedings. Moore v. John Hancock Mutual Life Insurance Company, 5 Cir., 1968, 398 F.2d 154. On remand, the action was heard by the district court sitting without a jury and findings of fact and conclusions of law were entered pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. In these the district court held, inter alia, that while Moore was entitled to have issued to him an individual policy "in any one of the forms then customarily issued by the Company, except term insurance", the individual policy issued Moore was in a form customarily issued by John Hancock since it contained a customary "combination of printed provisions" used by John Hancock; that the individual policy so issued was a new, separate and independent contract and that the suicide clause was unambiguous and incapable of being construed as running from the beginning of the group coverage; and, finally, that there had been no mistake or fraud involved in the insertion of the suicide clause in the individual policy, so as to make the remedy of reformation unavailable.

There being no Florida law in point,[5] the appellant relies principally on the Tennessee decision of Baugh v. Metropolitan Life Ins. Co., 173 Tenn. 352, 117 S.W.2d 742 (1938) in arguing that the individual life insurance policy issued Moore pursuant to the conversion privilege was a *continuation* of the group policies under which he was insured while with Howard Johnson and that the phrase "date of issue" in the suicide clause refers to the date of issue of the initial group policy in 1960 and thus was no longer in effect when Moore died.[6]

---

5. This case, arising in Florida and brought under the diversity jurisdiction of the federal courts, is clearly controlled by the law of Florida under the doctrine of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

6. In *Baugh*, the limitation in the suicide clause was "one year from the date of issue hereof". After concluding that the individual policy issued pursuant to the

conversion provision in the group policy was a continuation of the group insurance contract, the Tennessee court found the language "one year from the date of issue hereof" ambiguous and resolved the doubt against the insurance company by holding that the limitation referred to the date of issue of the original group policy. In doing so, the Court relied on the earlier Tennessee case of Silliman v. International Life Ins. Co., 131 Tenn. 303, 174

However, even if we were to hold, as the appellant urges, that the individual policy was a *continuation* of the group policies rather than a separate and independent contract of insurance in its own right, it is doubtful that the phrase "date of issue" as used in the suicide clause could be construed to refer to the date of issue of the group policies, in light of the clear language of the application agreement to the effect that

Under any policy issued upon conversion from Group insurance, * * the date of issue of the new Policy shall be the day immediately following expiration of the period allowed for conversion in accordance with the group policy.

Rather, the controversy presented by this case can, in our opinion, be best resolved by a determination of whether the conversion privilege contained in the group policy in effect when Moore left Howard Johnson entitled Moore to an individual policy providing coverage identical to the coverage provided by the group policy; that is to say, whether, under the conversion privilege, Moore was entitled to an individual policy which included in its coverage the risk of death by suicide.[7] As was said by the Supreme Court in Aetna Life Insurance Co. v. Dunken, 266 U.S. 389, 45 S.Ct. 129, 69 L.Ed. 342 (1924):

> * * * The second policy here was issued in pursuance of, and was dependent for its existence and its terms upon, the express provisions of the contract contained in the first one. By those provisions, upon the single application of the insured, the new policy must issue. Nothing was left to future agreement. The terms of the new policy were fixed when the original policy was made. * * *

Our task is, thus, one of construing the terms of the conversion privilege under the applicable Florida rules of construction[8] and in light of the applicable Florida Statutes.[9]

---

S.W. 1131 (1915), which took the same approach where the suicide clause contained in a regular life insurance policy issued in exchange of a term policy was to be effective "within one year from the date on which this insurance begins". See also Aetna Life Insurance Co. v. Dunken, 266 U.S. 389, 45 S.Ct. 129, 69 L.Ed. 342 (1924), and Western & Southern Life Ins. Co. v. Shelby, 101 Ind.App. 1, 194 N.E. 197 (1935).

The appellee, John Hancock, relies on Provident Life and Accident Insurance Co. v. Kegley, 199 Va. 273, 99 S.E.2d 601 (1957); Lineberry v. Security Life and Trust Co., 238 N.C. 264, 77 S.E.2d 652 (1953) and Gans v. Aetna Life Ins. Co., 214 N.Y. 326, 108 N.E. 443 (1915), which, on similar facts, rejected the approach taken by *Silliman* and *Baugh* and held that a regular life insurance policy issued pursuant to the exchange or conversion provisions of the original policy was a separate and distinct contract and that the suicide clause in the second policy ran from the date of issue of that policy.

7. It is clear that suicide is a risk of loss that is either included or excluded from coverage, as the case may be. *See* 1 Appleman, Insurance Law and Practice, § 369 (1965), where it is stated: "Sui-

cide, rather than being a representation, is a cause of loss either accepted or excepted by the policy terms. Being a risk of loss, it would either be covered or not covered * * *". Further, in New England Mutual Life Insurance Company v. Mitchell, 4 Cir., 1941, 118 F.2d 414, cert. den., 314 U.S. 629, 62 S.Ct. 60, 86 L.Ed. 505, it is stated:

> * * * where a life policy contains a suicide clause, suicide is simply not a risk insured against in the first instance. A life policy promises payment in case of death; and the office of the suicide clause in such a policy is to except death by suicide from that promise. It is clear, therefore, that the suicide clause, whether it provides that the policy shall be void in case of suicide or that suicide is not a risk covered, is necessarily a limitation on coverage. Its effect is to except death by suicide from the promise to pay the amount of the policy in case of death. * * *

8. The recent case of Financial Fire & Casualty Company v. Callaham, Fla.Dist. Ct.App., 1967, 199 So.2d 529, 532–533, well summarizes the applicable Florida rules of construction by quoting New Amsterdam Casualty Co. v. Addison, Fla.

Both the conversion privilege and Florida Statute § 627.0415, supra, n. 3, provide, in essence, that a person eligible to exercise the conversion privilege shall be entitled to have issued to him by the Company, without evidence of insurability, an individual policy of insurance in any one of the *forms* then customarily issued by the company, except term insurance, in an amount equal to, or at the option of the employee, less than, the amount of the employee's insurance under the group policy at the premium applicable to the class of risk to which the employee belongs and to the form and amount of the policy at the employee's attained age at the date of issue of such individual policy.

John Hancock contends, and the district court so held, that these terms were complied with here in that Moore was issued a *form* of policy then customarily issued by John Hancock, *form* meaning a combination of printed provisions customarily issued, in an amount equal to the protection provided by the group policy, with an appropriate adjustment of premiums. We must disagree with this definition of "form", as the term is used in the conversion privilege. Applying the ancient doctrine of *ejusdem generis*,[10] and interpreting the general term "forms" in light of the specific phrase "term insurance", which follows and refers to it, leads to the conclusion that "forms" as used here means a generic type of insurance, such as ordinary life, endowment or term insurance and the various sub-types of these, rather than a combination of printed forms customarily issued, as concluded by the district court. This view is further buttressed by the deposition of Mr. Robert G. Ward, the Assistant Secretary of John Hancock, where he stated:

In the general class of ordinary individual insurance we have three *forms* of insurance: *Term* insurance, *life* insurance and *endowment* insurance. By that I mean ordinary life where the premiums are payable during the entire period of life for a short period, but the insurance is continued for the life of the individual.

\* \* \* \* \* \*

Under your policy for ordinary life, you have your 20 payment life, 10 payment life, 25 payment life, life policy with premiums payable to age 65, life policy of premiums paid to age 85, and so forth. Three year modified life, five year modified life. The distinctions are only in the method of the payment of the premiums.

(Emphasis supplied.) Appendix, 23–24.

It is likewise well established in Florida that when construing policies of insurance the court should give the language of the policy, when clear and unambiguous, its natural meaning. See Reliance Mutual Life Insurance Co. of

---

Dist.Ct.App., 1964, 169 So.2d 877, to the effect that

" \* \* \* in construing an insurance policy to determine the intention of the parties, a court must consider the instrument in its entirety ; and, if reasonably possible, that construction should be adopted which will give effect to the *total* instrument and to each of its various provisions. \* \* \* If the language used is clear and unambiguous, it will be accorded its natural meaning. \* \* \* The court should not extend strictness in construction to the point of adding a meaning to language that is clear \* \* \* "

and then noting that

\* \* \* Florida law renders applicable to contracts of insurance the principle that, where a contract of insurance is prepared and phrased by the insurer, it is to be construed liberally in favor of the insured and strictly against the insurer, where the meaning of the language is doubtful, uncertain, or ambiguous.

9. "Any provision of the Florida statutes applicable to the subject-matter of a contract is as much a part and parcel of such contract as if written into the same in haec verba \* \* \* ". Clemons v. Clemons, Fla.Dist.Ct.App., 1967, 197 So. 2d 38, 40, cert. den. (Fla.) 204 So.2d 215.

10. See Arnold v. Shumpert, Fla., 1968, 217 So.2d 116 ; State ex rel. Winton v. Town of Davie, Fla., 1961, 127 So.2d 671.

Ill. v. Booher, Fla.Dist.Ct.App., 1964, 166 So.2d 222, 224. Therefore, we cannot agree that John Hancock necessarily complied with the terms of the conversion privilege by issuing a three-year modified life policy to Moore containing a two-year suicide clause.

Under this construction of the term "forms", the conversion privilege is unfortunately vague and ambiguous as to exactly what coverage Moore was entitled to under a converted policy. It simply says that "the amount of such individual policy shall be equal to (or at the option of the employee, less than) the amount of the employee's insurance hereunder * * * ". The term "amount" necessarily refers to the *quantity* of coverage, rather than the *quality* of coverage such as the risks accepted or excluded, but the fact that Moore was entitled under the conversion privilege to an equal amount of coverage in terms of dollars and cents is an indication that he was entitled to an equal "amount" of coverage in terms of the risks protected against.

■ The use of the term "conversion" in the caption of the conversion privilege lends further support to the view that Moore was entitled to identical coverage under his individual policy as that provided under the group policy.[11] The ordinary meaning of a right of conversion in an insurance policy is a device by which the rights enjoyed under one type of policy, such as a group or term policy, may be *continued* in another type of policy, at the option of the insured. Indeed, there would be no reason for the insertion of a right of conversion in a policy if the insured could thereby get nothing more than what would have been available had there been no right of conversion and he had simply made application for a new policy of insurance with no relation to the prior policy. The court in Silliman v. International Life Ins. Co., supra, n. 6, 174 S.W. at 1133, expressed the notion admirably when it said, speaking of an insured who had committed suicide shortly after having exchanged a term life policy for one of ordinary life containing a one-year suicide clause:

> When he had lived through that year, and so outlived the [suicide] clause in [his term policy], he had attained a status with the company more valuable than the one he held when he obtained his policy in 1910. We cannot think that it was his purpose to waive that advantage, or of the company by indirection to take it from him.

Finally, it is well established in Florida that an ambiguous provision in an insurance policy must be construed against the insurance company. Continental Casualty Company v. Gold, Fla.1967, 194 So.2d 272; Financial Fire & Casualty Company v. Callaham, supra, n. 8. Moreover, it is well to keep in mind that John Hancock could have effectively excluded the risk of suicide from the coverage afforded under any individual policy available under the conversion privilege by the addition to the conversion privilege of express language to that effect.[12]

Taking all these factors into consideration, it is our conclusion that, absent any express provision to the contrary, Moore was entitled, under the conversion privilege contained in the group policy, to an individual policy with coverage identical to that provided by the group policy, and that since suicide was a risk covered by the group policy, the two-year suicide clause contained in the converted policy is a nullity, without force or effect.

11. Under Florida law an ambiguous provision may be explained by its caption. See Winter Garden Ornamental Nursery, Inc. v. Cappleman, Fla.Dist.Ct.App., 1967, 201 So.2d 479.

12. See e. g. Lowes v. Pan-American Life Insurance Company, 8 Cir., 1966, 355 F.2d 433, where additional benefits for accidental death were expressly excluded from the coverage of any policy of insurance available under a conversion clause similar to the one presented here.

Consequently, we hold that Moore's widow, the appellant in this case, is entitled to receive the full face amount of the converted life insurance policy which was in effect when Moore died.

The judgment of the district court is reversed.

Reversed.