Joyce I. **BINKLEY**, Plaintiff-Appellant,

v.

**MANUFACTURERS LIFE INSURANCE COMPANY**, Defendant-Appellee.

No. 72–1263.

United States Court of Appeals, Tenth Circuit.

Jan. 9, 1973.

Rehearing Denied Feb. 28, 1973.

Robert L. Schmalzer, Denver, Colo., for plaintiff-appellant.

Raymond J. Turner, Denver, Colo. (Dawson, Nagel, Sherman & Howard,

Denver, Colo., on the brief), for defendant-appellee.

Before LEWIS, Chief Judge, and Mc-WILLIAMS and DOYLE, Circuit Judges.

McWILLIAMS, Circuit Judge.

The issue presented in this appeal is when a one-year suicide provision in a policy of life insurance commenced to run. The factual background out of which this dispute arose is not in dispute and on the contrary is agreed to by the parties.

Manufacturers Life Insurance Company, a Canadian corporation hereinafter referred to as the insurer, issued a group policy of insurance to the Bank of Denver, dated May 9, 1961, insuring all eligible employees of the Bank. One Arby J. Binkley, a Colorado resident hereinafter referred to as the insured, accepted employment with the Bank on May 9, 1966, and accordingly became covered under the aforesaid group policy previously issued the Bank by the insurer.

Pursuant to the terms of the group policy, the insurer on May 9, 1966, issued the insured a "Certificate of Insurance." The group policy incidentally had no suicide clause. The certificate issued the insured had a conversion clause which granted the insured certain rights should he terminate his employment with the Bank. These conversion privileges play a considerable role in the present controversy and accordingly are now set forth in their entirety:

Article 26. CONVERSION PRIVILEGE OF OBTAINING AN INDIVIDUAL POLICY OF LIFE INSURANCE. If an employee's insurance or part thereof terminates, he will have the privilege of converting his insurance so terminated to an individual policy of life insurance, without being required to furnish evidence of insurability, subject to the following conditions:

(a) Written application for the policy and payment of the first premium thereon must be made not later than 31 days after the date of termination of his employment.

(b) The policy will not contain Total Disability, Accidental Death and Dismemberment, Double Indemnity or other supplementary benefits and must be on a plan, other than term insurance, then regularly issued by the Insurance Company at the insurance age under the policy, that is at his age on his birthday nearest to the policy year date of the policy. The employee can elect that the policy include single premium preliminary or interim term insurance for a period of not more than 12 months. *The policy will be issued on the form then in use by the Insurance Company and will include any clauses then regularly included in any individual life policy then customarily issued by the Insurance Company.*

(c) The sum insured under the policy must not be more than the amount of his Life insurance which so terminates, and must not be less than the minimum required by the Insurance Company for the plan selected.

(d) The premium for the policy will be calculated at the insurance age under the policy and from the table of premium rates then in use for the class of risk to which he belongs. The premium must not be less than the minimum required by the Insurance Company for the premium frequently selected.

(e) The policy will become effective at the end of the 31 day period after the date of termination of his employment.

\* \* \* \* \* \*

If the employee dies during the 31 day period within which he is entitled to convert his insurance to an individual policy and before any such individual policy has become effective, the sum insured under such individual policy which the employee is entitled to have issued to him will be payable as a claim under the group policy, whether or not application for the individual policy

or the payment of the first premium therefor has been made. (Emphasis added.)

On or about May 26, 1969, the insured terminated his employment with the Bank and prior thereto, on March 24, 1969, to be exact, he made application with the insurer for an individual policy of life insurance to replace the group policy coverage.

On May 26, 1969, the insurer issued the insured an individual policy of insurance, with Joyce I. Binkley, the insured's wife, being designated as primary beneficiary. The individual policy provided as follows:

"If the life insured commits suicide whether sane or insane within 1 year from this policy's date of issue, the Company's liability under the policy will be limited to the sum of the premiums paid under the policy decreased by any indebtedness."

On November 5, 1969, the insured died and his death was agreed to have been a suicide. The beneficiary then made claim against the insurer for payment of the face amount of the individual policy issued the insured and the claim was rejected on the basis of the one-year suicide clause. The beneficiary then instituted the present action to compel payment by the insurer. In response to the complaint, the insurer filed an answer setting up the one-year suicide as a defense. Both the insurer and the beneficiary thereafter filed motions for summary judgment, each averring that there were no genuine issues of fact. The trial court, upon hearing, denied the beneficiary's motion for summary judgment, and granted that of the insurer. The beneficiary now appeals the summary judgment entered in favor of the insurer. We affirm.

It is the beneficiary's position that the group policy and the individual policy issued the insured when he terminated his employment with the Bank are but a single, continuing contract of insurance and that accordingly the one-year suicide clause in the individual policy commenced to run as to the insured on May 9, 1966,

the date when the insured came under the group policy and was issued a Certificate of Insurance. It is the position of the insurer that, on the contrary, the group policy and the individual policy are separate and distinct contracts and that the suicide clause in the individual policy by its own terms commenced to run on the date of issuance of the individual policy, namely, May 26, 1969. As indicated, the trial court upheld the insurer's position and entered judgment in favor of the insurer.

■ It is agreed that Colorado law applies to the present controversy. However, there apparently is no Colorado law on the particular point here involved. In such circumstance, we, as an appellate court, should accept the trial court's determination of state law unless such appears to be clearly erroneous. Sta-Rite Industries, Inc. v. Johnson, 453 F.2d 1192 (10th Cir. 1972), cert. denied, 406 U.S. 958, 92 S.Ct. 2062, 32 L.Ed.2d 344 (1972); Manville v. Borg-Warner Corporation, 418 F.2d 434 (10th Cir. 1969); and Cranford v. Farnsworth & Chambers Company, 261 F.2d 8 (10th Cir. 1958). In our view, the trial court's determination is not clearly erroneous and on the contrary is quite correct.

■■ The general rule as applied to the admitted facts of the instant case would appear to be that if the terms of the individual policy were the same as those of the group policy or if the terms of the individual policy were in accord with the provisions of the conversion clause in the group policy, then the individual policy and the group policy would be deemed a single, continuing contract to the end that the suicide clause in the individual policy would have commenced to run as the date of issuance of the group policy and as to the insured as of May 9, 1966. However, if the terms of the individual policy differ from the terms of the group policy and are not in accord with the provisions of the conversion clause in the group policy, then the individual policy is separate and distinct from the group policy to the end that the suicide clause in the individual

policy would commence to run from the date of issuance of the individual policy. In our view, the individual policy issued the insured differs from not only the general terms in the group policy, but differs also from the provisions in the conversion clause in the group policy. Let us examine these two policies a bit more closely.

The two policies differ in that the group policy contained no suicide clause, whereas the individual policy did, which is of course the nub of this controversy. Additionally, under group policy the coverage afforded the insured was $12,000, whereas the coverage afforded under the individual policy was $15,000. And this was true even though the conversion clause of the group policy specifically provided that the "sum insured under the policy must not be more than the amount of his Life insurance which so terminates * * *."

Similarly, the individual policy contained a total disability premium waiver benefit provision as well as double indemnity accidental death benefits, even though the conversion clause of the group policy again specifically provided that the individual policy "will not contain Total Disability, Accidental Death & Dismemberment, Double Indemnity or other supplementary benefits * * *."

We are also informed that the insured took a medical examination as a part of his application for the $15,000 individual life policy, even though the conversion clause in the group life policy specifically provided that the insured had the privilege of converting "without being required to furnish evidence of insurability." Without belaboring the matter, it is clear to us, as it was to the trial court, that the individual policy issued the insured was a different policy than the group policy which covered him during his employment with the Bank. Being separate and distinct from the group policy, the suicide clause in the individual policy therefore commenced to run on May 26, 1969, all of which conforms to the very language of the suicide clause itself, which provides that there would be only limited recovery if the insured commits suicide within one year "from this policy's date of issue."

In support of our resolution of this controversy, see such cases as Nielsen v. General American Life Insurance Co., 89 F.2d 90 (10th Cir. 1937); Jarmon v. American Heritage Life Insurance Co., 267 A.2d 601 (Del.Super.1970); Provident Life & Accident Ins. Co. v. Kegley, 199 Va. 273, 99 S.E.2d 601 (1957); and Gans v. Aetna Life Ins. Co., 214 N.Y. 326, 108 N.E. 443 (1915).

We recognize that the cases relied on by the beneficiary may at first blush appear to be contrary to our disposition of the present case. However, in our view they are, at least in the main, distinguishable from the instant case on their facts. For example, in Aetna Life Insurance Company et al. v. Dunken, 266 U.S. 389, 45 S.Ct. 129, 69 L.Ed. 342 (1924), the Supreme Court, after recognizing that whether a second contract of insurance made in pursuance of the provisions of an earlier one is to be deemed a separate contract or a single, continuing one, is a "matter not always free from difficulty," went on to hold there that the second contract and the earlier one were but one continuing contract and in so holding observed that "the terms of the new policy were fixed when the original policy was made." In the instant case, as noted, the terms of the individual policy differed from those called for by the terms of the group policy.

Similarly, in Moore v. John Hancock Mutual Life Insurance Co., 436 F.2d 823 (5th Cir. 1971), where the Fifth Circuit was applying Florida law, the Fifth Circuit did not turn the case on a determination as to whether the individual policy was separate and distinct from the earlier group policy, or a continuation of the group policy. Rather, the Fifth Circuit viewed the suicide clause in the individual policy as a "nullity" and held that the conversion clause in the group policy entitled the insured to an individual policy which included in its coverage the risk of death by suicide. It should be noted that in *Moore* the beneficiary sought

reformation of the individual policy. In the instant case, the beneficiary recognized the validity of the suicide clause in the individual policy and sought only a declaration that it be deemed to have commenced to run on the date the insured received his Certificate of Insurance under the group policy.

Finally, the Tennessee cases, i. e., Baugh v. Metropolitan Life Insurance, 173 Tenn. 352, 117 S.W.2d 742 (1938), and Silliman v. International Life, 131 Tenn. 303, 174 S.W. 1131 (1915), like *Dunken,* in finding a continuing contract of insurance emphasized the fact that the terms of the second policy were "in strict accord with the provisions of the first policy." Here, the terms of the individual policy are not "in strict accord" with the provisions of the group policy, but differ therefrom in substantial particulars.

Regardless of whether our disposition of the present controversy be in accord with the authorities relied on by the beneficiary, we certainly cannot say that the trial court's determination of this diversity case was clearly erroneous, and, on the contrary, under the circumstances we believe its determination of the matter to be correct.

Judgment affirmed.

LEWIS, Chief Judge (concurring).

I concur in the main opinion but wish to add a brief comment.

It makes good judicial administrative sense to recognize that a trial judge is knowledgeable of the state law in his resident state and to accord appropriate weight to his expertise in this regard on appeal. But this acceptable premise becomes unacceptable, even a judicial fallacy, when extended as a foundation for a self-imposed rule, seemingly developed from varying language in some of our earlier opinions and reiterated here, to the effect that the interpretation of state law by a trial court should be accepted by this court unless such interpretation is "clearly erroneous". Surely "clearly

erroneous" should not be confused with the words of art contained in the context of Rule 52(a), Fed.R.Civ.P., and thus be a positive limitation upon the scope of appellate review. Accordingly I choose to treat the words as words of convenience and subject to flexible application. To do otherwise would indeed be a fallacy under the particular circumstances of this case.

The trial judge, Judge Finesilver, is resident in Colorado and earlier served as a state trial judge. In another case I would have no hesitancy in subjectively leaning on his recognized expertise in Colorado law. But I need not do so in this case and for the best of reasons. My Brothers McWilliams and Doyle are also resident in Colorado; and each came to this court after extended and distinguished service on the Colorado Supreme Court. All three are in agreement in this case as to the proper interpretation of applicable Colorado law. I share their views and so concur.

WILLIAM E. DOYLE, Circuit Judge (concurring).

I concur in the opinion and the result of Judge McWilliams, but wish to add some comments.

To be sure, the insured had a right to convert the group policy. This right is conferred not only by the initial policy but also by Colorado statute.[1] All of the indications are, however, that the individual policy was really a new contract. The insured underwent a physical examination which was explicitly not required for conversion; the individual policy was in the amount of $15,000 rather than the $12,000 amount of the group policy; the individual policy included a suicide clause. In this light, it must be said that the insured contracted for a new policy with additional terms and coverage and the beneficiary is bound by such contract. While the new policy was then occasioned by the conversion clause of the group policy, it had little if any other connection to it.

1. Colo.Rev.Stat. § 72–6–2(9) (1963).