723 P.2d 722

**UNITED FENCE COMPANY, INC., an Arizona corporation, Plaintiff-Appellant,**

v.

**GREAT–WEST LIFE ASSURANCE COMPANY, Defendant-Appellee.**

**No. 1 CA–CIV 8651.**

Court of Appeals of Arizona, Division 1, Department B.

July 15, 1986.

uation of, or is independent of, a prior policy for the purpose of applying a two-year suicide exclusion clause found in both policies. This is a case of first impression in Arizona. Collateral issues involve the applicability of the principles announced in *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 682 P.2d 388 (1984) concerning standardized forms of agreement and reasonable expectations of coverage; and the propriety of the trial court's denial of appellant United Fence Company's (United Fence) motion for rehearing of summary judgment.

On April 24, 1980, the appellee, Great-West Life Assurance Company (Great-West) issued a whole life, participating policy to Russell Gunderson as trustee of the Stephen J. Lee Irrevocable Trust, insuring the life of Stephen Lee. The policy number was 2275581 and was based on the issue age of thirty-seven years. The face amount of the policy was $1,000,000. The yearly premiums, including a disability waiver of premium, were $16,940.76. Gunderson was an independent insurance agent and advisor of Stephen Lee, the insured and owner of United Fence.

The 1980 policy provided that the owner could change the plan of insurance and maintain or lower the face amount, based on the 1980 issue date and thirty-seven year issue age:

> If the Company agrees, the Owner may exchange this policy for a new policy on a different plan of insurance. The new policy will be eligible for dividends. It will have the same Issue Date, Issue Age, and Insured as this policy.
>
> The Face Amount of the new policy may not exceed the Face Amount of this policy. The premium rate will be the rate used for the new plan of insurance on this Issue Date for the mortality class in which this policy has been placed. The Company will determine any other requirements or costs.

In addition, the owner could transfer all rights of ownership in the 1980 policy to a new owner.

Mueller & Luikens by Thomas G. Luikens, Phoenix, for plaintiff-appellant.

Sorenson, Moore & Julian by Timothy W. Evens, Phoenix, for defendant-appellee.

## OPINION

JACOBSON, Presiding Judge.

This appeal raises the question of whether a second life insurance policy is a contin-

On June 29, 1983, Gunderson requested that Great-West replace the 1980 policy with a policy in the face amount of $1,500,000 on the life of Lee, naming United Fence as owner and beneficiary of the policy. In response, Great-West required that Lee submit to a new medical examination and obtained an Equifax Services Business Report concerning Lee and his business, United Fence.

On August 4, 1983, Great-West issued a whole life with premium adjustment provision, non-participating policy[1] to United Fence, insuring the life of Lee. Lee was the president of United Fence, and he and his wife were its sole owners. The policy number was 4813879 and was based on the issue age of forty-one years. The face amount of the policy was $1,500,000. The yearly premiums, which did not include a disability waiver of premium, were $3,190, a reduction of some $13,000 in premiums from the 1980 policy.

The 1980 policy and the 1983 policy contained identical suicide exclusions:

> If the Insured commits suicide, while sane or insane, within 2 years from the Issue Date, the Company will pay only the premiums paid on this policy.

The issue date of the 1980 policy was April 24, 1980; the 1983 policy specified the issue date as August 4, 1983.

Lee signed a statement that the 1983 policy would "replace" the 1980 policy. Lee also surrendered the 1980 policy in exchange for its cash value, pursuant to Great-West's request form:

> The owner surrenders this policy and all claims under it. In exchange, the Company will pay the surrender value of the Policy as full settlement, provided that it is not prohibited by law from doing so (eg) bankruptcy, tax lien etc. The surrendered will take effect as of the date the Company receives this request; on that date, the surrender insurance ends.

Great-West sent Gunderson $1,971.98, "IN FULL SETTLEMENT OF ALL CLAIMS UNDER POLICY NO. 2275581." On April 30, 1984, approximately 10 months after the issue date of the 1983 policy, Lee committed suicide.

Great-West denied liability for the $1,500,000 claim submitted by United Fence under the 1983 policy; it sent Gunderson a check for the premiums paid under the 1983 policy, pursuant to the 1983 suicide exclusion clause.

On January 9, 1985, United Fence filed a complaint against Great-West for breach of the insurance contract and bad faith denial of payment of insurance proceeds. Great-West moved for summary judgment on both counts. United Fence opposed Great-West's motion for summary judgment on grounds the 1983 policy was a continuation of the 1980 policy and, applying the rationale of *Darner, supra,* the 1983 policy did not represent the true agreement between the parties.

By minute entry dated May 21, 1985, the trial court granted Great-West's motion for summary judgment. On June 12, 1985, United Fence filed a motion for rehearing of summary judgment, based on newly discovered facts and legal authority. The trial court denied that motion and entered judgment in favor of Great-West. In so doing, the court found that the 1983 policy was a new policy, not a continuation of the 1980 policy, based upon the numerous material differences between the two policies.

## WAS THE 1983 POLICY INDEPENDENT OF THE 1980 POLICY?

■ United Fence argues that the 1983 suicide exclusion did not apply to prevent recovery because the 1983 policy was a continuation, not independent, of the 1980 policy. Thus, United Fence maintains that the time limits of the 1980 policy apply and since Lee committed suicide more than two

---

1. This policy was a hybrid of a whole life and a term policy. For the first twenty years, the maximum yearly premium increased from $3,190 to $114,370. Thereafter, the policy had a cash surrender value and the maximum yearly premiums remained fixed at $134,845.

years after the 1980 issue date, recovery on the 1983 policy is permitted.

> It is true, as United Fence contends, that:
>
> The general rule ... would appear to be that if the terms of the individual policy were the same as those of the group policy or if the terms of the individual policy were in accord with the provisions of the conversion clause in the group policy, then the individual policy and the group policy would be deemed a single, continuing contract to the end that the suicide clause in the individual policy would have commenced to run as the date of issuance of the group policy.
> ...

*Binkley v. Manufacturers Life Insurance Co*, 471 F.2d 889, 891 (10th Cir.) *cert. denied*, 414 U.S. 877, 94 S.Ct. 130, 38 L.Ed.2d 122 (1973). *See generally,* 9 G. Couch, *Cyclopedia of Insurance Laws* § 40:53 (1985); 1B J. Appleman and J. Appleman, *Insurance Law and Practice,* § 499 (1981); Annot. 37 A.L.R.3d 933, 951 (1971). However, in determining whether a second life insurance policy is independent of or a continuation of the policy which it replaces, courts have focused on two important considerations: (1) whether there exist substantial differences between the two policies; and (2) whether the second policy was issued pursuant to a conversion provision in the old policy.

In *Binkley*, after a medical examination, the insurer issued a new individual policy containing a total disability waiver benefit provision and a double indemnity accidental death provision, for a face amount increased from $12,000 to $15,000. The conversion provision of the old group policy did not permit these new provisions nor the increase in the face amount of the policy. Neither was a medical examination required. The court concluded that the new policy was not a continuation of the old policy because "the terms of the individual policy are not 'in strict accord' with the provisions of the group policy, but differ therefrom in substantial particulars." 471 F.2d at 893.

In *Nielsen v. General American Life Insurance Co.,* 89 F.2d 90 (10th Cir.1937), the insurer issued a new policy which contained a double indemnity provision and which was based on a different issue date and age. As in *Binkley*, the conversion provision in the old policy also did not authorize the new terms. The trial court found that the purpose of insured's surrender of the old policy was to obtain the cash value of the old policy. The appellate court held that the new policy was not issued pursuant to the conversion provision and upheld the trial court's conclusion that the new policy was a new independent contract.

In this case, United Fence does not assert that the 1983 policy was issued pursuant to the 1980 conversion provision. We therefore must determine if the two policies are sufficiently similar to allow "continuation" principles to apply. In doing so, we note that virtually every negotiated provision in the 1980 policy, except the identity of the insured, was materially changed in the 1983 policy. United Fence increased the face amount of the policy by 50% and decreased the premiums due in 1980 by 80%. Even the owner and beneficiary of the policies are different. Under these circumstances we conclude that the trial court was correct in finding that the 1983 policy was a new policy, and not a continuation of the 1980 policy, based on the numerous material and substantial differences between the policies.

The cases cited by United Fence in support of its "continuation" argument are all distinguishable, as they addressed the issuance of new policies pursuant to conversion provisions in the old policies. *E.g., Swanson v. First Fidelity Life Insurance Co*, 214 Neb. 654, 656, 335 N.W.2d 538, 540 (1983) ("The language of that application ties the 1980 policy to the 1970 policy and refers to the transaction as a change in, and conversion of, the 1970 policy"); *Baugh v. Metropolitan Life Insurance Co.,* 173 Tenn. 352, 356, 117 S.W.2d 742, 743 (1938) ("[T]his significant sentence is 'Application is hereby made for the conver-

sion of the insurance on the life of the subscriber hereto under Group Policy No. 81838 G., (Certificate No. 61) in accordance with the (Privilege of Continuance) provision' ..."); *Silliman v. International Life Insurance Co.*, 131 Tenn. 303, 312, 174 S.W. 1131, 1133 (1914) ("Not only is there nothing to show that the policy of 1914 is 'an independent, complete, and isolated contract,' ... but, on the contrary, it is expressly shown that they are connected, and that the second was issued because of and in compliance with the requirements of the first."); *Occidental Life Insurance Co. v. Hurley*, 513 S.W.2d 897, 900 (Tex.Civ.App. 1974) ("It was stipulated that the new policy was issued in accordance with the terms of the rider. Therefore, in our opinion, the rights, obligations, and liabilities of the parties were fixed by the prior contract and effectuated by the exchange").

United Fence also argues that the 1983 policy is ambiguous. This argument is based on United Fence's application for insurance in 1983, which contained the statement: "The Policy Now Applied For Will Replace Policy No. 2,275,581 with Great West Life." United Fence argues that the word "replace" may mean the 1983 policy was a continuation of the 1980 policy.

We do not consider this argument because it is made for the first time on appeal. *See Yano v. Yano*, 144 Ariz. 382, 697 P.2d 1132 (1985).

### IS DARNER APPLICABLE?

■ United Fence cites *Darner, supra,* and argues that the agreement between the parties is not reflected in the terms of the 1983 policy. In particular, United Fence argues that the 1983 suicide exclusion as written was beyond the range of Gunderson's reasonable expectations. United Fence further argues it does not make sense that, in obtaining the 1983 policy, United Fence would give up Lee's enhanced status under the 1980 policy.

United Fence's arguments are based in large part on Gunderson's testimony that he had understood the 1980 suicide exclusion applied:

> The boiler plate language contestability clause and suicide exclusion of a preprinted policy were not specifically discussed in relation to [the 1983 policy]. It was my understanding that Great-West had agreed to issue [the 1983 policy] as continuation of Mr. Lee's previous coverage; that the new policy to be owned by United Fence Company, Inc., merely replaced [the 1980 policy]. As I was informed that Mr. Lee's experience under [the 1980 policy] satisfied the underwriting requirements for continuation of one million dollars of policy benefit, I understood that such experience also satisfied the suicide clause, and the contestability clause as to one million dollars.

In *Darner,* the Arizona Supreme Court analogized so-called "boiler plate" to the rule stated in § 211 of the Restatement (Second) of Contracts. In § 211, the Restatement recognizes that "[a] party who makes regular use of a standardized form of agreement does not ordinarily expect his customers to understand or even to read the standard terms." *Restatement (Second) of Contracts* § 211 comment b (1981). As recently noted by the Arizona Supreme Court *"Darner* is ... a methodology for interpretation of boilerplate provisions in transactions in which the seller of the product or service does business in such a way that the fact finder can conclude it is improbable that the customer will read or understand the boilerplate." *State Farm Mutual Automobile Insurance Co. v. Bogart,* 149 Ariz. 145, 717 P.2d 449, 455 (1986).

In this case, of course, the insured, Stephen Lee, since he was deceased, could not testify that he neither read nor understood the 1983 suicide exclusion. Rather, this testimony comes from the insurance agent, Gunderson. Gunderson had been writing insurance for fourteen years and Great-West was the major insurer with which he dealt. At one time, he was employed by Great-West as a branch manager for Arizona. In addition, suicide exclusions are com-

mon in life insurance policies. 9 G. Couch, *Cyclopedia of Insurance Law* § 40:1 (1985); 1B J. Appleman & J. Appleman, *Insurance Law and Practice* § 492 (1981). Here, the 1983 suicide exclusion was unambiguously stated as one of the eleven general provisions. Moreover, Gunderson's actions in regard to the 1980 policy are completely inconsistent with a "reasonable expectation" that the 1980 policy survived its cancellation. Among other things, Gunderson applied for and received $1971.98 as the cash surrender value of the 1980 policy. In addition, Lee signed a form acknowledging that this payment constituted "full settlement" of all claims under the first policy. Under these circumstances *Darner* simply does not apply.

On this issue, United Fence also argues it does not make sense that, in exchanging the 1983 policy for the 1980 policy, it would give up Lee's enhanced status under the 1980 policy. Presumably, United Fence is asserting that it reasonably expected that the 1980 suicide exclusion would apply to the 1983 policy. We will not speculate on United Fence's motivation, apart from noting that United Fence may have given up Lee's enhanced status in order to increase the face amount of the policy and also decrease its premium payments by a substantial amount.

SHOULD THE TRIAL COURT HAVE GRANTED THE MOTION FOR REHEARING OF SUMMARY JUDGMENT?

■ United Fence argues that the trial court improperly denied its motion for rehearing of summary judgment, in which United Fence presented additional facts and legal authority.

The additional facts were based on the affidavits of Gunderson and Dr. Fatheree, which were submitted with the motion. United Fence fails to explain why it did not elicit this testimony in opposing Great-West's motion for summary judgment. Gunderson had already testified on behalf of United Fence, as addressed in its opposition to Great-West's motion for summary

judgment. Dr. Fatheree was the physician who examined Lee prior to issuance of the 1983 policy. Great-West stated that his medical records had always been available to United Fence.

These affidavits, as with the argument concerning the Department of Insurance regulations discussed later, were clearly untimely and not "newly discovered evidence" under Rule 59(a), Rules of Civil Procedure, under which United Fence sought relief. The trial court could and did reject these items on this basis alone. On the merits, the Gunderson affidavit was simply a rehash of his prior affidavit and his conclusionary opinions as to the interpretation of Great-West Underwriting File Notes and subsequently adopted programs by Great-West. These did not raise material issues of disputed fact.

Dr. Fatheree's affidavit was to the effect that he thought he was examining Mr. Lee in connection with a $500,000.00 policy. United Fence attempts to bootstrap this understanding into a factual dispute as to whether there was only a "new" policy on $500,000. worth of coverage thus $1,000,000. of coverage was under an "old" policy against which the suicide exclusion would not apply. First, there is no indication that Dr. Fatheree had authority to bind Great West as to this "understanding", or even where this understanding originated. Secondly, Dr. Fatheree stated that his notes and his prior affidavit did not mean that he had any knowledge that Great-West intended to underwrite only $500,000. Under these circumstances, Dr. Fatheree's "understanding" is completely immaterial.

■ United Fence also cited, for the first time in its motion for rehearing of summary judgment, A.C.R.R. R4–14–215 of the Arizona Official Compilation of Administrative Rules and Regulations. United Fence argues that Great-West should be estopped to deny that the 1980 exclusion applied to the 1983 policy. In particular, United Fence notes that an insurer has a duty to give a notice regarding replacement of life insurance. The notice must be signed by the insured and must disclose, in part, that

"[u]nder [applicant's] existing policy, the period of time during which [insurer] could ... deny coverage for death caused by suicide, may have expired or may expire earlier than it will under the proposed policy." A.C.R.R. R4–14–215 (F)(3)(a), Exhibit B. Gunderson testified that to the best of his knowledge United Fence never received this notice.

However, the notice need only be given to an applicant who already owns an existing life insurance policy. Here, United Fence was not the applicant which owned the 1980 policy, that policy being owned by a trust. Under these circumstances, the trial court did not err in refusing to reconsider its previous granting of summary judgment.

Based on the foregoing, we affirm the judgment of the trial court.

CORCORAN and CONTRERAS, JJ., concur.