John Michael KING, Sr., Beverly King, John Michael King, Jr., a Minor, and Angela Lynn King, a Minor, by their Next Friend, Beverly E. King, Plaintiffs,

v.

PROVIDENT LIFE & ACCIDENT INSURANCE COMPANY, a Tennessee Corporation; Alco Management, Inc., a Tennessee Corporation, and Motel Restaurant, Inc., Defendants.

Civ. A. No. 3:92–cv–124WS.

United States District Court,
S.D. Mississippi,
Jackson Division.

March 23, 1995.

---

Don H. Goode, Dossett, Goode, Barnes & Broom, Jackson, MS, S. Dennis Joiner, Join-

er & Polk, Jackson, MS, for John Michael King, Sr., Beverly E. King.

Roy H. Liddell, Kenna L. Mansfield, Jr., Wells, Wells, Marble & Hurst, Jackson, MS, for Provident Life and Accident Insurance Company.

Virginia T. Munford, Watkins & Eager, Jackson, MS, for Alco Management, Inc., Motel Restaurant, Inc.

## MEMORANDUM OPINION AND ORDER

WINGATE, District Judge.

■ Before the court are the parties' respective motions for summary judgment in the above styled and numbered cause. The parties agree that this case is governed by the Employment Retirement Income Security Act of 1974, Title 29 U.S.C. §§ 1001–1461 (hereinafter "ERISA"), and the amendments to ERISA under the Consolidated Omnibus Budget Reconciliation Act, Title 29 U.S.C. §§ 1161 through 1168 (hereinafter "COBRA").[1] The plaintiffs (hereinafter the "Kings") filed their first lawsuit pertaining to this matter on May 9, 1990, in state court, asking for injunctive relief, damages, and costs. The Kings sought to enjoin Provident Life & Accident Insurance Company (hereinafter "Provident") and the other defendants from terminating the group medical coverage of John Michael King, Sr. Provident and the other defendants removed the case to the United States District Court for the Southern District of Mississippi (see Civil Action No. J90–0272(B)) where the Kings immediately sought injunctive relief. The federal court denied the Kings' request for injunctive relief; the matter proceeded to discovery; and dispositive motions were filed by the parties. On June 3, 1991, the parties' mo-

tions for summary judgment came on for hearing before the federal district court, the Honorable William H. Barbour presiding. There, it was noted by the federal court that the Kings had asserted for the first time in their briefs that they had been denied an adequate opportunity to convert John Michael King, Sr.'s group plan to individual coverage. Judge Barbour, finding that this issue did not appear in the Kings' complaint and that no attempt had been made to amend the complaint, denied the King's request to amend their complaint as untimely and entered judgment in favor of Provident on all the other issues. However, Judge Barbour noted that the Kings could file another lawsuit and assert their "inadequate opportunity to convert claim." No appeal was taken from Judge Barbour's ruling.

The Kings filed the instant lawsuit on February 28, 1992, and the parties filed motions for summary judgment. This court entered summary judgment in favor of Provident on June 24, 1993, finding that the inadequate opportunity to convert claim was barred by federal principles of claim preclusion.[2] However, this court's ruling was reversed by the United States Court of Appeals for the Fifth Circuit in *King v. Provident Life & Accident Insurance Company*, 23 F.3d 926 (5th Cir. 1994) (holding that Judge Barbour's statement to the Kings that they could file another lawsuit operated as a reservation of right which limited the preclusive effect of dismissal so that dismissal did not bar the claim under the doctrine of res judicata). Hence, the case was remanded to this court for consideration of the King's claims under ERISA and COBRA. Jurisdiction over this matter is predicated on Title 28 U.S.C.

---

**1.** Congress enacted COBRA in order to require employers who participate in group health plans to continue to provide health coverage to employees who leave work under certain statutorily prescribed circumstances such as termination. Congress was concerned that group plan participants and their dependents not be placed in a situation in which they suffer a gap in the character of coverage as the result of a qualifying event such as termination. *See Brock v. Primedica, Inc.*, 904 F.2d 295, 297 (5th Cir.1990). Hence, pursuant to the amending statute, coverage must extend for at least 18 months after the qualifying event (termination), and may, in the event of multiple qualifying events, extend up to

36 months. See Title 29 U.S.C. § 1162(2)(A)(i) and (ii).

**2.** Res judicata bars all claims that were or could have been advanced in support of the plaintiff's cause, not merely those which were adjudicated. *Ocean Drilling & Exploration Company, Inc. v. Mont Boat Rental Services*, 799 F.2d 213 (5th Cir.1986); *Bullard v. Webster*, 679 F.2d 92, 93 (5th Cir.1982); *Jennings v. Caddo Parish School Board*, 531 F.2d 1331 (5th Cir.1976); *Palmer Exploration, Inc. v. Dennis*, 759 F.Supp. 332, 335 (S.D.Miss.1991).

§ 1331 which provides that "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

## PERTINENT FACTS

John Michael King, Sr., (hereinafter "King") was employed as the manager of Danver's Restaurant in Jackson, Mississippi, between 1982 and 1987. The parent corporation of Danver's Restaurant was Motel Restaurant, Inc., the entity that provided medical, disability, and hospitalization insurance for the Kings through a "Group Protection of Employees of Alco Properties, Inc., Group Plan" (hereinafter the "Plan"). Benefits under the Plan were provided through a group policy numbered K–997–F35F and issued by the defendant Provident. King became enrolled in and covered under the Plan on March 1, 1987. King's spouse and children also were covered under this policy. There is no suggestion in the record before this court that the Kings were not made aware at the commencement of their coverage under this policy of the benefits it provided.

In the summer of 1987, only a short time after he was enrolled in the Plan, King was diagnosed to be suffering with amyotrophic lateral sclerosis, also called "Lou Gehrig's disease," a motor neuron disease characterized by muscular weakness, atrophy, and progressive degeneration of the nervous system. On August 6, 1987, the extent of King's physical deterioration necessitated the termination[3] of his employment with Danver's Restaurant. At the time of his termination, King received from the administrator of the Plan a "Notice to Persons Whose Group Health Benefits are Terminating."[4] Pursuant to this notice, King was offered the opportunity to extend his group insurance coverage under the Plan for at least an additional eighteen months in accordance with COBRA, Title 29 U.S.C. §§ 1161 through 1168. This continuing coverage was the same as the coverage enjoyed by King under the Plan while he was employed with Danver's Restaurant, the only difference being that King was required to pay the premium.

Pursuant to COBRA, King began paying premiums for continuing benefits under the Plan in December of 1987. Over the next year, King's health continued to decline. Eventually, King was placed in a hospital's intensive care unit. King's apparently imminent demise prompted his family to inquire about removing King from the hospital and obtaining home nursing care. King's physician acquiesced, believing that King had no longer than six months to live. Under the Plan's "Alternative Treatment Benefit" provisions, home health care qualified as a covered expense. So, Provident agreed to pay for the cost of home health care in lieu of the vastly more expensive cost of hospitalization. According to Judge Barbour's opinion in Civil Action No. J90–0272(B), the parties do not dispute that the Kings' decision to opt for home health care resulted in a savings to Provident and the Plan of approximately $30,000.00 per month in medical expenses.

In January, 1989, the Kings learned that Provident intended to terminate coverage under the Plan in May of 1989. The Kings retained the services of an attorney who contacted Provident regarding the Plan's conversion coverage.[5] The attorney was informed by letter dated March 29, 1989, that

---

**3.** See 29 U.S.C. § 1163(2) ( ... the term "qualifying event" means, with respect to any covered employee, ... termination).

**4.** The notice requirements of COBRA at 29 U.S.C. § 1166(a) are, in pertinent part, as follows:

(1) the group health plan shall provide, at the time of *commencement* of coverage under the plan, written notice to each covered employee and spouse of the employee (if any) of the rights provided under this subsection,

(2) the employer of an employee under a plan must notify the administrator of a qualifying

event described in [in section 1163] ... within 30 days ... of the date of the qualifying event,
....

(4) the administrator shall notify ...
[upon the *occurrence of any qualifying event* under section 1163, any qualified beneficiary with respect to that event] of such beneficiary's rights under this subsection. (emphasis added)

**5.** According to the Kings, their attorney, Jacqueline Smith Pierce, demanded on behalf of the Kings that upon termination of Mr. King's coverage, Provident offer Mr. King continued coverage through a conversion plan "which is at least as good" as that which Mr. King had before his employment terminated.

available benefits for converted policies are dependent on the state in which the insurance contract was sitused, that is, the State of Tennessee. The letter noted that Provident was required to offer only hospital/surgical benefits. Finally, the letter explained that while converted medical benefits were not required by either state or federal regulations to be the same as the benefits offered under the group coverage, medical benefits under COBRA had to be identical with the benefits offered under group coverage.

A copy of the Plan provided to the Kings' attorney provided in pertinent part:

> If you have been covered under the Plan for a period of 3 months and your medical coverage under the plan ceases because:

6. The Plan was issued in the State of Tennessee. Tennessee law, during the relevant time period, provided as follows with respect to conversion coverage to be offered to group plan participants whose group coverage was to terminate:

> Optional coverage. (a) Subject to the provisions and conditions of this part, the employee or member shall be entitled to obtain a converted policy providing, at his option, coverage on an expense incurred basis under any one (1) of the plans meeting the following requirements:
>
> (1) Plan A:
>
> (A) Hospital room and board daily expense benefits in a maximum dollar amount approximately the average semiprivate rate charged in metropolitan areas of this state, for a maximum duration of seventy (70) days;
>
> (B) Miscellaneous hospital expense benefits of a maximum amount of ten (10) times the hospital room and board daily expense benefits; and
>
> (C) Surgical operation expense benefits according to a surgical schedule consistent with those customarily offered by the insurer under group or individual health insurance policies and providing a maximum benefit of eight hundred dollars ($800);
>
> (2) Plan (B):
>
> (A) Hospital room and board daily expense benefits in a maximum dollar amount equal to seventy-five (75%) of the maximum dollar amount determined for Plan A, for a maximum duration of seventy (70) days;
>
> (B) Miscellaneous hospital benefits of a maximum amount of ten (10) times the hospital room and board daily expense benefits; and
>
> (C) Surgical operation expense benefits according to a surgical schedule consistent with those customarily offered by the insurer under group or individual health insurance policies and providing a maximum benefit of six hundred dollars ($600); or
>
> (3) Plan (C):

(a) your employment ceases:

> \*   \*   \*   \*   \*   \*

> you may apply for a conversion plan *providing hospital and surgical benefits.* (emphasis added)

> \*   \*   \*   \*   \*   \*

*The amount of coverage provided will be subject to and determined by the laws of the state where the plan is issued* (emphasis added).[6] The coverage provided will not be identical to the coverage provided under this Plan. You have to apply within 31 days after coverage ends. The conversion plan will be subject to the rules and premiums that apply to such plans at that

> (A) Hospital room and board daily expense benefits in a maximum dollar amount equal to fifty percent (50%) of the maximum dollar amount determined for Plan A, for a maximum duration of seventy (70) days;
>
> (B) Miscellaneous hospital benefits of a maximum amount of ten (10) times the hospital room and board daily expense benefits; and
>
> (C) Surgical operation expense benefits according to a surgical schedule consistent with those customarily offered by the insurer under group or individual health insurance policies and providing a maximum benefit of four hundred dollars ($400).
>
> The maximum dollar amounts in Plan A shall be determined by the commissioner of commerce and insurance and may be redetermined by him from time to time as to converted policies issued subsequent to such redetermination. Such redetermination shall not be made more often than once in three (3) years. The maximum dollar amounts in Plans A, B, and C shall be rounded to the nearest multiple of ten dollars ($10.00).
>
> (b) The insurer may also, in lieu of the plans of benefits set forth above, provide alternative plans with benefits exceeding those in Plan A, B, or C, with the approval of the commissioner.
>
> (c) If the benefits level required in subsections (a) and (b) exceed the benefits level provided under the group policy, the conversion policy may offer benefits which are substantially similar to those provided under the group policy in lieu of those required in subsections (a) and (b).
>
> (d) The insurer may, at its option, also offer alternative plans of group health conversion in addition to those required by this part.

Tenn.Code Ann. § 56–7–1507 (1989 replacement).

time. A description of conversion plan benefits, rates for coverage and application form will be given to you at the time your coverage under this Plan ends. If issued, the conversion plan will go into effect on the day following the date coverage under the Plan ended.

The individual conversion policy offered by Provident in accordance with Tennessee law governing conversion policies provided for hospital and surgical benefits, but neither alternative treatment benefits nor home health care services were available under the conversion policy.[7] Provident steadfastly has maintained the position that it did not have to give King an opportunity to purchase a policy of conversion coverage which offered the same benefits as King enjoyed under the Plan. Consequently, the Kings did not apply for the conversion policy within 31 days after termination of group coverage, now arguing that Provident's conversion policy failed to provide adequate benefits.[8]

However, any immediate crisis was avoided when Provident informed the Kings that their group coverage under the Plan was being extended an additional twelve months pursuant to the Plan's extended benefits provision. Twelve months later, the extended benefits were exhausted, and Provident notified the Kings on March 22, 1990, that all benefits under the Plan would be terminated on May 31, 1990. Consequently, the Kings filed their first lawsuit in state court on May 9, 1990. Provident removed the Kings' state court action to this court, and the matter was assigned Civil Action No. J90–0272(B).

In Civil Action No. J90–0272(B), after injunctive relief was denied and the matter came on for hearing on the parties' motions for summary judgment, the Kings argued, among other things, that Provident had agreed to continue to provide private home care for "as long as was necessary," thereby modifying the provisions of the Plan. The

Kings based this assertion on the representation of a Plan agent, Jill Stone, that Provident would provide private nurses and medical supplies for home care, "as long as necessary." Additionally, the Kings pointed to an insurance verification form completed by one Ramona Deere of Kimberly Home Health Care based on information supplied to Deere by Stone. In the blank indicating the policy's maximum benefits, Deere had written the word "unlimited."

Judge Barbour considered several issues at the hearing on the parties' motions for summary judgment, to include whether ERISA governed the action, thereby preempting the state law claims; whether an oral or written modification to the Plan was cognizable under the facts of the case; whether representations were made, independent of the Plan, so that collateral agreements to provide unlimited coverage to plaintiffs were created; and whether various legal claims not asserted in the complaint should have been considered by the court in the interests of justice. Judge Barbour found that ERISA governed the Plan, citing *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir.1982), and that ERISA preempted the Kings' state law claims, citing *Pilot Life Insurance Company v. Dedeaux*, 481 U.S. 41, 47, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987), and *Davis v. Time Insurance Company*, 698 F.Supp. 1317 (S.D.Miss.1988). Next, Judge Barbour held that the oral modifications alleged by the Davises were unenforceable, citing *Lister v. Stark*, 890 F.2d 941 (7th Cir.1989), *cert. denied*, 498 U.S. 1011, 111 S.Ct. 579, 112 L.Ed.2d 584 (1990) (ERISA does not recognize the validity of an oral modification of a pension plan); *Straub v. Western Union Tel. Co.*, 851 F.2d 1262, 1265–66 (10th Cir.1988) (no liability for purported oral modification of terms of an employee benefit plan); and *Nachwalter v. Christie*, 805 F.2d 956, 957 (11th Cir.1986) (same).

7. According to the Kings, in April of 1989, Provident forwarded by cover letter a "copy of the conversion provisions for Alco Properties, Inc." The Conversion Group Hospital–Surgical Insurance Policy contained no home health care treatment; and the benefits were only payable for a maximum of either thirty-one or seventy days during the period of disability.

8. No one disputes that Provident offered the Kings an opportunity to convert their coverage to a conversion policy. However, upon learning that the conversion policy provided more limited benefits than those available under the Plan, the Kings elected not to convert.

Judge Barbour noted that the United States Court of Appeals for the Fifth Circuit expressed accord with this view in *Cefalu v. B.F. Goodrich Co.*, 871 F.2d 1290 (5th Cir. 1989), and in *Degan v. Ford Motor Co.*, 869 F.2d 889 (5th Cir.1989). Then, Judge Barbour held that informal writings such as the verification of insurability form could not modify the terms of an employee benefit plan, citing *Nachwalter v. Christie*, 805 F.2d 956, 957 (11th Cir.1986); and *Johnson v. Central States, Southeast and Southwest Areas Pension Fund*, 513 F.2d 1173, 1174–75 (10th Cir.1975). Finally, Judge Barbour concluded that he could not resolve the issue of whether the Kings were given an adequate opportunity to convert their insurance coverage to an individual policy as required under the Plan, stating that the Kings retained the right to file another lawsuit with regard to this claim. As previously noted, no appeal was taken from Judge Barbour's ruling. Instead, the Kings filed the instant lawsuit before this court. On remand from the Fifth Circuit, this court finds that the issues for resolution before this court are whether the Kings were given adequate notice of their right under the Plan to convert their coverage to an individual policy and whether the Kings were given adequate opportunity to convert their continuing coverage to such a policy.

### *PLAINTIFFS' ARGUMENT*

The Kings contend that this matter is controlled by two cases, *Baker v. Washington National Ins. Co.*, 823 F.2d 156 (5th Cir. 1987), and *Schnabel v. Philadelphia American Life Ins. Co.*, 795 F.Supp. 816 (S.D.Tex.), *motion to amend judgment denied*, 807 F.Supp. 1268 (1992). In *Baker*, the Fifth Circuit reviewed a circumstance similar to the instant case from the Southern District of Mississippi. The district court found the insurer liable where the group life and health insurer gave a privilege of converting [9] to an individual policy, but did not distinguish in any way the coverage that was provided by the conversion policy. The Fifth Circuit upheld the finding of the district court that, absent any restriction or explanation as to the nature of the coverage to be provided by the conversion policy, the right of conversion had to be construed as the right to continue the basic group coverage in another type of policy, citing *Moore v. John Hancock Mutual Life Ins. Co.*, 436 F.2d 823 (5th Cir.1971) (holding that the ordinary meaning of a right of conversion in an insurance policy is a device by which rights enjoyed under one type of policy may be continued in another type of policy, at the option of the insured), and *Aetna Life Insurance Co. v. Dunken*, 266 U.S. 389, 45 S.Ct. 129, 69 L.Ed. 342 (1924) (a subsequent contract made in pursuance of an unrestricted provision of an earlier one is to be regarded as a continuation of the status of the first). *See Baker*, 823 F.2d at 158. Recognizing the general principal that unclear and ambiguous language in a contract of insurance will be construed in favor of the insured, *Government Employees Insurance Co. v. Brown*, 446 So.2d 1002, 1006 (Miss. 1984), the *Baker* Court found that the language of the insurer's conversion privilege amendment was not tied by common understanding or express language to any definite level of coverage. Thus, the *Baker* Court found such language to be an empty promise and upheld a ruling that a bald promise of conversion without restriction or other limitation meant continuation of the same level of coverage enjoyed under the group plan.

Additionally, the Kings note, the *Baker* Court undertook to suggest how insurance companies could avoid this harsh ruling by listing four alternatives which included but were not limited to:

(1) a company can state in its contract that it will offer a specific level of coverage in its conversion policy as easily as it can omit any reference to providing a conversion privilege;

---

9. The conversion privilege amendment under scrutiny in *Baker* provided in pertinent part:

    The privilege of conversion from the group insurance provided by the group policy to an individual policy of health shall be available to an insured person and/or his dependents under the circumstances specified.... If proper application is made within the conversion period [31 days ...] ..., the company will issue *its then current conversion policy to a person entitled to the conversion privilege* ... (emphasis added).

(2) it can attach the conversion policy it will issue to the group policy;

(3) it can refer to a form of conversion policy on file with the employer or the state insurance authority; and

(4) it can delineate what particular risk it will cover or exclude in any conversion policy it may issue.

*Baker,* 823 F.2d at 159.

The Fifth Circuit concluded that if a company includes an undertaking to offer a conversion policy and its promise is no more definite than that it will issue an undisclosed, undefined form of conversion policy, it is bound to furnish at least one that is no less advantageous to the insured than the coverage it agrees to convert. *Baker,* 823 F.2d at 159.

In *Schnabel,* the insured became terminally ill and had to end his employment. After the insured's continuing benefits under his group plan were exhausted, the insured sought a conversion policy, claiming that he was entitled to a conversion policy with the same maximum lifetime benefits he enjoyed under the terms of his group policy. As in *Baker,* the plan's conversion privilege clause[10] did not define the individual contract to be issued either by reference to a particular contract form or by any attachment to the group policy. The insured was denied a conversion policy with the same maximum lifetime benefits, so, he filed suit in state court. The matter was removed to federal court, and the parties submitted their respective motions for summary judgment. Relying on *Baker,* the district court found that the insurer's use of general language to describe the conversion privilege created a contractual duty to continue all the coverage offered in the insured's group policy. *Schnabel,* 795 F.Supp. at 824, citing *Baker,* at 158.

The Kings argue that, just as the insurers in *Baker* and *Schnabel,* Provident has described the benefits of the conversion privilege in the instant case only in general terms. Moreover, say the Kings, Provident waited until after John Michael King, Sr., made his

request for a conversion policy which would provide the same or similar benefits as the Plan before it finally explained what its conversion policy would cover. Provident, says the Kings, did not state in its group policy any specific level of coverage for the conversion policy; nor did it attach a conversion policy to the group policy; nor did Provident refer to a form of conversion policy on file with King's employer or the state insurance authority; nor did Provident delineate what particular risks would be covered or excluded in the conversion policy. Therefore, say the Kings, under the holdings of *Baker* and *Schnabel,* John Michael King, Sr., is entitled to judgment as a matter of law on his cross-motion for summary judgment on the issue of Provident's liability. The matter of damages, say the Kings, is the only issue remaining to be tried in this case.

In summary, the Kings insist that John Michael King, Sr., is entitled to convert his group benefits under the Plan to an individual policy offering the same benefits as provided under the Plan. Provident, say the Kings, has at all times tried to get King to apply for a thirty-one day hospital plan which would not provide any home health care coverage. Provident, say the Kings, is attempting to do what the Kings contend is prohibited in *Baker*—to wait until the end of the Plan's continuing benefits to determine the extent of the plaintiff's illness—and only then to design and disclose a description of the benefits under the conversion policy.

### DEFENDANTS' ARGUMENT

Provident responds on behalf of all the defendants that the Kings are not entitled to the requested relief as a matter of law. According to Provident, the Kings' claim of entitlement to perpetual and unlimited conversion policy benefits which are identical to those previously available to Mr. King under the Plan runs contrary to ERISA's provision, through COBRA, for a specific and limited level of continuation coverage upon cessation of eligibility. Thus, says Provident, King has

---

**10.** The conversion privilege clause in *Schnabel* provided in pertinent part that the insurer would, "issue an individual contract, in a form customarily issued by (the insurer), with benefits not

greater than the benefits provided by this Contract." The conversion privilege failed to define the individual contract to be issued.

received all the coverage to which he is entitled under the Plan and under ERISA. Moreover, says Provident, contrary to assertions of the Kings, Provident never made a promise to provide King with a conversion policy that was unrestricted or without qualification.

Provident says the Kings' claim must fail for several reasons. Firstly, says Provident, the Kings are seeking more than they are entitled to receive under the terms and provisions of the Plan. Secondly, Provident argues that the Kings' claim is in conflict with what is required of Provident under ERISA. Thirdly, says Provident, the two decisions upon which the Kings base their claim, *Baker v. Washington National Insurance Co.*, 823 F.2d 156 (5th Cir.1987), and *Schnabel v. Philadelphia American Life Ins. Co.*, 795 F.Supp. 816 (S.D.Tex.1992), are state law decisions which have been preempted by ERISA. Finally, Provident says that even if *Baker* and *Schnabel* do apply to this case, Provident already has provided the level of benefits it would be required to provide under the rulings of those cases.

Provident contends that the very issue now before the court was addressed by the Ninth Circuit Court of Appeals in *Tingey v. Pixley–Richards West, Inc.*, 953 F.2d 1124 (9th Cir. 1992). In *Tingey*, says Provident, an employee who had been terminated by his employer sought to compel a group insurer to provide an individual conversion policy to cover medical expenses incurred in treatment of his child's congenital birth defects. In an attempt to avoid ERISA preemption, the plaintiff maintained that the insurer had violated a state insurance conversion law by failing to allow him to convert his policy. Inasmuch as his claim was based upon a state law regulating insurance, plaintiff claimed that it was saved from preemption. The Ninth Circuit acknowledged that a state law specifically designed to regulate insurance would normally be saved from preemption pursuant to the "saving clause" under ERISA found at Title 29 U.S.C. § 1144(b)(2)(A).[11] The Ninth Circuit noted, however, that state laws which are at odds with specific ERISA provisions are preempted by ERISA, notwithstanding the saving clause. The *Tingey* Court concluded that "[t]o apply the saving clause would allow the employee to end-run an explicit ERISA provision;[12] the employee's remedy under state law might allow for a perpetual right to health benefits." "This is at odds," said the Ninth Circuit, "with the limits on conversion rights to health benefits set by Congress in ERISA itself, and is contrary to the exclusive nature that Congress intended ERISA-created rights to have." *Tingey*, 953 F.2d at 1133.[13] Therefore, says Provident, this court should give no weight to the cases relied on by the Kings, *Baker* and *Schnabel*, because their holdings do not take into consideration the limits Congress, through COBRA, placed on conversion rights.[14] Thus, according to Provident, the Kings are attempting to place obligations and duties upon Provident which go far beyond those imposed by ERISA. This, says Provident, is completely contrary to the exclusivity of ERISA in governing

---

**11.** The saving clause provides in pertinent part that, "nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities."

**12.** The specific provisions of COBRA to which the Ninth Circuit referred were §§ 1162(2) and 1162(5) which respectively limit continuing benefits to 18 months (or up to 36 months) for multiple qualifying events; and provide for a conversion option when continuation coverage expires.

**13.** Provident additionally relies on the case of *Rasmussen v. Metropolitan Life Ins. Co.*, 675 F.Supp. 1497 (W.D.La.1987). In *Rasmussen*, a husband and wife brought suit against the husband's former employer and its insurer demand-

ing, among other things, issuance of a conversion policy with benefits equal to those contained in the group plan under which they were formerly covered as required by state law. The district court held that ERISA preempts all such state law claims, noting specifically "that the plaintiffs' right to be covered existed solely by virtue of an ERISA employee health benefit plan."

**14.** Provident also contends that *Baker* was decided under Mississippi law and *Schnabel* was based upon *Baker* and Texas law. Thus, argues Provident, the Kings' reliance on these cases is misplaced due to ERISA's preemptive effect on state law based claims; and the rules announced in those cases are not germane to an analysis of Provident's obligations under the facts presented in the instant case.

conversion rights under group health insurance plans and should not be permitted.

Therefore, Provident argues, based on *Tingey* and the authority therein cited, that the Kings' request for a conversion policy that offers the same benefits as the Kings enjoyed under the Plan runs afoul of ERISA and COBRA. Provident contends that, pursuant to COBRA, it was required to provide the Kings with an opportunity to continue their coverage under the Group Plan for a maximum of 18 months after it would have otherwise terminated. 29 U.S.C. § 1162(2)(A). Then, pursuant to the extended benefits feature of the insurance policy, Provident notes that it was required to and did provide an additional 12 months of coverage to the Kings. Then, says Provident, it was required to offer a conversion policy to the Kings. This was done, says Provident, but the Kings rejected the conversion policy offer and demanded that Provident provide a perpetual right to health benefits. Citing *Tingey*, Provident argues that the Kings' claim is wholly at odds with the limits placed by Congress on continuation coverage and on the conversion privilege applicable to health benefits in COBRA.

Alternatively, Provident argues that, absent ERISA preemption, the cases of *Baker* and *Schnabel* do not support the Kings' claims for continuing conversion coverage under the facts of this case. Provident notes that the *Baker* decision involved an unrestricted promise to provide conversion coverage which in no way limited the benefits to be provided under the conversion plan in issue. Specifically, Provident notes, the insurer in *Baker* promised to provide the company's "then current conversion policy to a person entitled to the conversion privilege." *Baker*, 823 F.2d at 157. This Court, says Provident, held that such a bald promise of conversion amounted to a promise of continuation of the group coverage already enjoyed by the insured since the company's promise to provide conversion coverage was no more definite than [a promise to] issue an undisclosed, undefined form of conversion policy.

Provident contends that, unlike the conversion policy in *Baker*, its contract provision restricted the scope of conversion coverage to be provided. According to Provident, when notice of the Plan's benefits was first given to the Kings, the Plan expressly limited conversion coverage offered thereunder by stating clearly and unambiguously that "[t]he [conversion] coverage provided will not be identical to the coverage provided under this [group] plan." Moreover, says Provident, its conversion provision, unlike *Baker*'s and *Schnabel*'s, is neither "undisclosed" nor "undefined" as to the coverage provided. Not only did the group policy affirmatively limit conversion coverage from the outset, argues Provident, but it also specifically informed the Kings as to the level of coverage to be provided when it stated:

> The amount of coverage provided will be subject to and determined by the laws of the State where the plan is issued.

The Plan, says Provident, was issued in Tennessee; hence, the nature and amount of benefits pursuant to the Plan's conversion privilege provision were governed by Tennessee law.[15] Thus, says Provident, it made an unambiguous and specific promise to provide conversion coverage in accordance with and as determined by Tennessee law. That law, says Provident, is very specific and cannot be characterized as either bald or unrestricted.

After the Kings' continuing benefits were exhausted and they were notified both through their attorney and by separate notice of their conversion privilege, Provident says it adhered to the Tennessee statute in offering the Plan's conversion options. Therefore, declares Provident, it kept the promise it made to the Kings in every respect. Furthermore, Provident notes that the specifics of the conversion options offered by Provident to the Kings are set forth in the affidavit of their attorney, Jacqueline Smith Pierce. A review of those options, says Provident, reveals that they are identical to those set forth in the Tennessee statute quoted at footnote 6.

Finally, Provident argues that *Baker* does not hold that a company would be required to provide benefits under individual conversion policies identical to those provided under the

---

**15.** See the pertinent statutory provisions at footnote 6.

group plan.[16] Provident quotes from *Baker* as follows:

> All we hold is that if a company includes an undertaking to offer a conversion policy and its promise is no more definite than that it will issue an undisclosed, undefined form of conversion policy, it is bound to furnish at least one that is no less advantageous to the insured than the coverage it agrees to convert.

823 F.2d 156, 159. Provident points to the four above cited examples of methods given by the *Baker* Court by which companies can limit the coverage to be provided through their conversion policies.[17] Provident contends that it does not matter which of these methods a company utilizes as long as it provides its insureds with a means to determine a specific level of coverage to be provided through its conversion policy. Provident says its first notice of benefits under the Plan informed the Kings of their conversion coverage rights and that the extent of this coverage was to be determined by Tennessee law. Provident argues that there is no significant difference between (a) making reference in a group plan to a form of conversion policy on file with the state insurance authority which is one of the methods suggested in the *Baker* decision, and (b) making reference to the statutory provision which mandates the level of coverage to be offered under said policies as Provident has done. Either way, says Provident, the Kings were fully informed of the coverage being provided. Inasmuch as *Schnabel* involved virtually the same conversion provision as found in *Baker*, Provident

submits that the conversion privilege provisions in both *Baker* and *Schnabel* are distinguishable from the conversion privilege provision of the Plan in the instant case. Hence, the holdings of those two cases, says Provident, should not be applied in the instant case.

Therefore, Provident concludes that John Michael King, Sr., has been provided all the coverage or benefits which COBRA mandates. What the Kings ask this court to do, says Provident, is to go beyond COBRA's requirements and require Provident to continue providing King the same coverage provided under the Plan for the remainder of his life. This, says Provident, is not permissible as a matter of law.

### ANALYSIS

■ COBRA requires that notification to covered persons and their spouses of their right to continuing benefits and thereafter their right to convert their group coverage to individual coverage must take place on two separate occasions—when their group coverage begins (the "commencement notice") and after the onset of a qualifying event such as termination from employment (the "qualifying notice"). *See* 29 U.S.C. § 1166–(a),[18] and Jorden, Pflepsen & Goldberg, *Handbook on ERISA Litigation*, § 5.03[A], pages 5–27 (1992).

Section 1166(a)(1) of COBRA places on the "group health plan" the duty at the commencement of coverage to provide written notice to the employee of his continuation

---

**16.** Provident notes that the Plan plainly and unambiguously states that the coverage provided under the conversion policy *will not be identical* to the coverage provided under the Group Plan.

**17.** The *Baker* Court stated that "[a] company can state in its contract that it will offer a specific level of coverage in its conversion policy as easily as it can omit any reference to providing a conversion privilege. It can attach the conversion policy it will issue to the group policy. It can refer to a form of conversion policy on file with the employer or the state insurance authority. It can delineate what particular risk it will cover or exclude in any conversion policy it may issue." *Id.* at 159.

**18.** The notice requirements of section 1166(a) are, in pertinent part, as follows:

(1) the group health plan shall provide, *at the time of commencement* of coverage under the plan, written notice to each covered employee and spouse of the employee (if any) of the rights provided under this subsection,

(2) the employer of an employee under a plan must notify the administrator of a qualifying event described in [in section 1163] ... within 30 days ... of the date of the qualifying event,

....

(4) the administrator shall notify ...

*upon the occurrence of any qualifying event* under section 1963, any qualified beneficiary with respect to that event] of such beneficiary's rights under this subsection. (emphasis added)

rights, but the statute does not specify who the "group health plan" is. *See Kidder v. H. & B. Marine, Inc.,* 932 F.2d 347, 356 (5th Cir.1991). However, relative to "qualifying notice," the United States Court of Appeals for the Fifth Circuit interprets section 1166(a)(1) to impose a duty on all the individual parties to a group plan to notify a terminated employee of the right to continued coverage under the plan. *Id.* at 356. There is no dispute that the Kings received notice of their right to continued coverage in the instant case after King's termination from employment on August 6, 1987. Moreover, neither party has raised an issue with regard to the requirement to provide the Kings commencement notice of their right to benefits pursuant to COBRA when King first became enrolled in the Plan on March 1, 1987.[19] Instead, the Kings have challenged the adequacy of their notice and contend that the notice they received failed to apprise them of the true nature of their conversion privilege. According to the Kings, Provident waited until the onset of King's illness to set the parameters of his conversion coverage, thereby avoiding continuing responsibility for home care coverage. Therefore, say the Kings, inasmuch as the conversion privilege was not delineated in any manner, it was a mere promise to provide conversion coverage. Pursuant to *Baker,* say the Kings, the conversion privilege must offer benefits equal to those the Kings enjoyed under the continuing benefits of the Plan.

■ This court has reviewed closely the conversion privilege set forth in the Plan at page 50 of the group insurance policy. Under that section entitled "Medical Coverage Available After Termination," the Plan provides that when a covered person's medical coverage ceases due to termination of employment, "you may apply for a conversion plan providing *hospital and surgical benefits* (emphasis added)." This provision says nothing with regard to the alternative of home care and could not have given the Kings the impression that the conversion policy would provide anything beyond hospital and surgical benefits. This provision was in

force at the time King became enrolled in the Plan on March 1, 1987. Thus, the Kings' assertion that Provident waited until after the onset of King's illness to elect to eliminate home care coverage from its conversion policy is not supported by the terms of the Plan. The Plan always provided for conversion to an individual policy offering hospital and surgical benefits.

■ The Plan also provides that the amount of coverage under a conversion policy would be subject to and determined by the laws of the State where the plan was issued. In the instant case, the Plan was issued in Tennessee. Tennessee's statute governing conversion of group insurance offers three alternative options from which one may select conversion coverage (see footnote 6 above). This provision was in force at the time King became enrolled in the Plan. The Kings challenge this provision, asserting that this case is governed by ERISA and, thus, that the state law conversion statute does not apply.

This court agrees that ERISA is the exclusive source of substantive law to be applied in this matter and that any state law claims are preempted and superseded by ERISA. *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987); *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *Davis v. Time Ins. Co.,* 698 F.Supp. 1317 (S.D.Miss. 1988). However, as noted by Provident, in *Tingey v. Pixley–Richards West, Inc.,* 953 F.2d 1124 (9th Cir.1992) at footnote 5, the Ninth Circuit found that state laws providing for conversion rights (such as the Tennessee statute in the instant case), are not preempted by ERISA when they are applied to the terms of ERISA plans, citing *International Resources, Inc. v. New York Life Insurance Co.,* 950 F.2d 294 (6th Cir.1991), *cert. denied,* 504 U.S. 973, 112 S.Ct. 2941, 119 L.Ed.2d 565 (1992). The Ninth Circuit distinguished this type circumstance from the situation where a state's notice requirements in its conversion statute conflicted with ERISA's specific no-

---

19. *See Lincoln General Hospital v. Blue Cross/ Blue Shield,* 963 F.2d 1136, 1139 (8th Cir.1992), finding commencement notice to have been pro-

vided as required by 1166(a)(1) where the parties did not raise an issue with regard to commencement notice.

tice requirements, citing *Howard v. Gleason Corporation*, 901 F.2d 1154, 1157 (2nd Cir. 1990).

In the instant case, this court finds that the Tennessee Statute in question, Tenn. Stat.Ann. § 56–7–107, being applied as it is to the terms of the Plan by providing for three conversion policy options, is not preempted by ERISA since it does not conflict with any specific provision of ERISA and does not usurp or otherwise interfere with ERISA's protection of covered employees.

In *Baker*, the Fifth Circuit declined to adopt a standard method for insurance companies to utilize in apprising insureds of their conversion rights. *See Ramsey v. Colonial Life Insurance Company of America*, 843 F.Supp. 1103, 1111 (S.D.Miss.1992), *aff'd*, 12 F.3d 472 (5th Cir.1994). Instead, the Court concluded that insurance companies could avoid the harsh result of *Baker* by ensuring that conversion coverages were available for inspection by the prospective insured. In *Ramsey*, the insurance company avoided the application of *Baker* by keeping a copy of a conversion policy on file with the employer. In the instant case, Provident's group insurance Plan was kept by Alco Properties, Inc., on behalf of King's employer, the parent corporation of Danver's Restaurant, Motel Restaurant, Inc. As previously noted, the Plan referred to the law of the state of issuance as determinative of the amount of conversion coverage. Since the Plan was issued in Tennessee, the applicable state law is Tenn.Stat.Ann. § 56–7–1507. No one has suggested that this statute could not have been made available to a prospective insured for inspection. Moreover, no one has suggested that the Plan itself was not available for inspection by a prospective insured. The Plan itself would have disclosed that the conversion privilege was limited to hospital and surgical benefits, thereby delineating, as suggested in *Baker*, the particular risk Provident would cover in any conversion policy it might issue.

*Baker* also suggests that an insurance company may avoid the holding's harsh result by referring to a form of conversion policy on file with the employer or the state insurance authority. In the instant case, the terms of the conversion policy were ascertainable by reference to the Plan on file with Alco Properties, Inc., and to Tenn.Stat.Ann. § 56–7–1507. Reference to these two sources in force at the time King was enrolled in the Plan reveals to a prospective insured that the conversion policy provided hospital and surgical benefits in accordance with any one of three options:

(1) Plan A:

  (A) Hospital room and board daily expense benefits in a maximum dollar amount approximately the average semi-private rate charged in metropolitan areas of this state, for a maximum duration of seventy (70) days;

  (B) Miscellaneous hospital expense benefits of a maximum amount of ten (10) times the hospital room and board daily expense benefits; and

  (C) Surgical operation expense benefits according to a surgical schedule consistent with those customarily offered by the insurer under group or individual health insurance policies and providing a maximum benefit of eight hundred dollars ($800);

(2) Plan (B):

  (A) Hospital room and board daily expense benefits in a maximum dollar amount equal to seventy-five (75%) of the maximum dollar amount determined for Plan A, for a maximum duration of seventy (70) days;

  (B) Miscellaneous hospital benefits of a maximum amount of ten (10) times the hospital room and board daily expense benefits; and

  (C) Surgical operation expense benefits according to a surgical schedule consistent with those customarily offered by the insurer under group or individual health insurance policies and providing a maximum benefit of six hundred dollars ($600); or

(3) Plan (C):

  (A) Hospital room and board daily expense benefits in a maximum dollar amount equal to fifty percent (50%) of the maximum dollar amount determined

for Plan A, for a maximum duration of seventy (70) days;

(B) Miscellaneous hospital benefits of a maximum amount of ten (10) times the hospital room and board daily expense benefits; and

(C) Surgical operation expense benefits according to a surgical schedule consistent with those customarily offered by the insurer under group or individual health insurance policies and providing a maximum benefit of four hundred dollars ($400).

Therefore, given that *Baker* and *Schnabel* involved mere offers of conversion coverage without more, this court is unpersuaded that the instant conversion privilege should be treated in accordance with the rationale of those two cases. In *Baker* and *Schnabel*, there was no collateral source which would provide any specifics with regard to the conversion coverage being offered. In the instant case, Provident has shown that its offer of conversion coverage could be ascertained more specifically by reference to the Plan and to the applicable state statute governing conversion of group insurance. The *Baker* Court stated that its harsh result would be applied where a company included an undertaking to offer a conversion policy and its promise was no more definite than that it would issue an undisclosed, undefined form of conversion policy. Inasmuch as Provident has undertaken to offer hospital and surgical benefits under its conversion policy in accordance with any one of three options set forth under Tennessee law, this court concludes that Provident's offer of conversion coverage is not congruent with the offers of conversion coverage found in *Baker* and *Schnabel*. Thus, as a matter of law, the Kings are not entitled to summary judgment on the issue of liability.

▪ Furthermore, COBRA requires employers to provide continued coverage under certain circumstances for former plan participants for specified time periods, usually either eighteen months or thirty-six months (if the employee is disabled) following termination of employment. The continuing coverage provided pursuant to COBRA is identical to that provided prior to termination of the employee's employment, but is limited in duration. The record before this court establishes that King was covered under the Plan administered by Alco Properties, Inc., as an eligible employee of Danver's Restaurant, whose parent company was Motel Restaurant, Inc., through August of 1987. When this employment was terminated due to King's illness, the Kings elected to receive continuation coverage under COBRA. As required by § 1162(2)(A)(ii) of COBRA, King was provided an additional eighteen months of group coverage from the date his employment terminated. This coverage continued through May of 1989. Then, pursuant to the extended benefits provision of the Plan, King was provided 12 additional months of coverage which continued until May 31, 1990. Until the continuing coverage and thereafter the extended coverage terminated, there was no reason for King to have elected to receive conversion coverage. *See Ramsey v. Colonial Life Insurance Company of America*, 12 F.3d 472, 479 (5th Cir.1994) (no reason to have purchased conversion coverage while the original coverage continued). Therefore, this court concludes that the Kings have received all the continuing benefits to which they were entitled under the Plan. Furthermore, this court finds that Provident and the other defendants are not required by the holdings in *Baker* and *Schnabel* to provide conversion coverage benefits equal to those the Kings enjoyed under the continuing benefits provision of the Plan.

▪ Finally, this court notes that King's continuing benefits under the Plan terminated on May 31, 1990. According to the Plan's conversion privilege, the Kings had thirty-one (31) days after May 31, 1990, to apply for conversion benefits. They did not do so, not because they were unaware of their conversion rights, but because they filed their first lawsuit pertaining to this matter on May 9, 1990, in state court, asking for injunctive relief, damages, and costs. Therefore, this court finds that the Kings have waived their right to convert to an individual policy by failing to apply for such coverage within thirty-one (31) days after continuing and extended benefits under the Plan terminated.

### CONCLUSION

Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Plainly, Rule 56 means what it says: "judgment ... shall be entered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c) further requires that the court enter summary judgment if the evidence favoring the non-moving party is not sufficient for the jury to enter a verdict in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). When the moving party has carried the Rule 56(c) burden, the opposing party must present more than a metaphysical doubt about the material facts in order to preclude the grant of summary judgment. *Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corporation*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

In the instant case, the Kings' hope for success in this matter rests upon their ability to show that the Plan's conversion privilege was nothing more than a mere promise to provide conversion coverage without restriction or limitation. The evidence belies this assertion and the assertion that Provident waited until after the onset of King's illness to set the parameters of its conversion policy liability. Without these salient factors, there is no basis for applying *Baker* and *Schnabel* and finding for the Kings as a matter of law.

Therefore, summary judgment in favor of the Kings on the question of liability as a matter of law is hereby denied. Furthermore, summary judgment as a matter of law in favor of Provident Life & Accident Insurance Company, Alco Management, Inc., and Motel Restaurant, Inc., is hereby granted.

A separate judgment shall be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

**SO ORDERED AND ADJUDGED.**